# Illinois Official Reports

## Appellate Court

---

**People v. Jones, 2017 IL App (1st) 123371**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTELETO JONES, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-12-3371 |
| Filed | September 8, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 00-CR-08223(02); the Hon. Domenica A. Stephenson, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Jennifer L. Bontrager, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Miles J. Keleher, and Christine Cook, Assistant State's Attorneys, of counsel), for the People. |

| Panel | JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Presiding Justice Reyes concurred in the judgment and opinion.
Justice Gordon dissented, with opinion. |

**OPINION**

¶ 1    Defendant Anteleto Jones was convicted in 2003 of first degree murder and sentenced to 44 years' imprisonment. In 2011, he filed a *pro se* motion for leave to file a successive postconviction petition that alleged two claims of actual innocence based on newly discovered evidence of (1) an eyewitness to the murder and (2) police misconduct and coercion to obtain defendant's confession. The circuit court denied both defendant's motion for leave to file the petition and subsequent motion to reconsider that denial.

¶ 2    On appeal, defendant argues the circuit court erroneously denied him leave to file a successive postconviction petition because he presented a colorable claim of actual innocence based on the affidavit of Telvin Shaw, which defendant claims is newly discovered exculpatory evidence. Defendant also argues for the first time on appeal that he established cause and prejudice to file a successive postconviction petition because previously unavailable evidence showed that the police officers who coerced his confession were liable in a civil case of fabricating a confession in another murder investigation.

¶ 3    On June 30, 2016, a majority panel of this court reversed and remanded the circuit court's denial of defendant's motion for leave to file his successive postconviction petition. However, after the State filed a petition for rehearing and defendant filed an answer, this court, on December 6, 2016, allowed the State's petition for rehearing, which nullified the June 2016 opinion by operation of law. Oral argument was held on December 13, 2016.

¶ 4    For the following reasons, we affirm the judgment of the circuit court, which did not err by denying defendant leave to file his successive postconviction petition.

¶ 5                                    I. BACKGROUND

¶ 6    Defendant Anteleto Jones was convicted in 2003 of the first degree murder of Jerry Green and found to have personally discharged a firearm during the offense. The shooting occurred about 5 a.m. on January 8, 2000, when the victim attempted to enter his parked car after leaving the house of his friend, Curtis Moore. The victim's relative, Lawrence Green, also resided at that house. Lawrence was the leader of a street gang faction that was at war with the rival faction to which defendant belonged. The victim, however, was not affiliated with either gang faction.

¶ 7    Defendant was arrested in March 2000 and gave statements to the police and a videotaped confession admitting to his participation in the offense and implicating codefendants Melvin Jones and Travis Ashby. All three were charged with the first degree murder of the victim.

¶ 8                                A. Pretrial and Jury Trial

¶ 9    Prior to trial, defendant moved to suppress his statements, asserting that he (1) had been interrogated after electing to remain silent and requesting an attorney and (2) had been

physically coerced by the polygraph examiner, Officer Robert Bartik, who allegedly pushed, shoved, and punched defendant. At the suppression hearing in October 2001, Officer Bartik and Detectives Robert Lenihan, Timothy Nolan, and Michael Rose denied defendant's allegations. Defendant did not testify or call any witnesses. The trial court denied the motion to suppress.

¶ 10     Defendant and Ashby were tried simultaneously before separate juries in January 2003. The State's evidence showed that defendant, Melvin, and Ashby were members of the same gang faction. On the date in question, they agreed to arm themselves and go into rival gang territory to Lawrence Green's house and shoot him. Their plan was retaliation for a humiliating beating Melvin had received the day before in front of his girlfriend. Lawrence's house, 7159 South Seeley Avenue, was at the end of the block on the northeast corner of the intersection of Seeley Avenue and 72nd Street. The victim had parked his two-door car across the street from the house, on the south side of 72nd Street and facing east toward Damen Avenue. A garage that faced 72nd Street was in front, or east, of the victim's car.

¶ 11     According to defendant's statements to the detectives and his videotaped statement, he, Ashby, and Melvin left their car near 73rd Street and walked north through the alley between Damen and Seeley Avenues toward 72nd Street. Ashby and Melvin waited in the alley on the north side of 72nd Street, behind Lawrence's house, and defendant waited in the alley on the south side of 72nd Street, behind a garage. The group waited about 10 or 15 minutes and saw the victim exit Lawrence's house and cross 72nd Street to the victim's parked car. Melvin left the north alley first, approached the victim, stood in front of him, confronted him, and swore at him. Melvin stood about two feet in front of the victim by the open car door. The victim waved his hands and said he was not involved in the matter. When Ashby emerged from the north alley, he walked about three to four feet behind Melvin and went about three feet to the right side of Melvin. When defendant left the south alley, he went about 8 to 10 feet behind them and about 8 to 10 feet on the far left side of Melvin. Melvin, who used a .380 semiautomatic gun, fired six or seven gunshots, and the victim fell to the ground. Ashby, who used either a .45 or a 9-millimeter gun, fired three to four gunshots. Defendant used a .357 handgun and fired two gunshots toward the victim as he was falling. Melvin ran east on 72nd Street toward Damen Avenue, and Ashby and defendant ran south down the alley toward 73rd Street.

¶ 12     Inside the house, Moore was using a phone and heard 5 to 10 gunshots, some of which seemed like they were right next to his window, while others did not sound as loud. Moore dropped the phone, woke his fiancée, and told her the victim had just gone outside. Moore left his bedroom and went to the back of the house, looked out a window, and then went outside. He found the victim unresponsive and lying on his side in the street by the door of his car. His feet pointed toward the front of the car and his head toward the rear of the car. Moore did not see who shot the victim, nor did he see anyone run from the scene. People began to come outside, and Moore told someone to call 911. The victim sustained five gunshot wounds and died at the hospital.

¶ 13     Odis Deal, who lived nearby at 7200 South Damen Avenue, testified that he heard the gunfire at about 5 a.m. He first heard two to three gunshots, and then eight or nine gunshots followed, one right after the other. Deal had been in the army and heard gunfire before. The first two or three gunshots sounded different from the rest, like the shots were coming from two or three different guns. About five to six minutes after the firing stopped, Deal went

outside to the back of his home, which was located on the southwest corner of 72nd Street and Damen Avenue. He saw police cars and an ambulance and then went back inside.

¶ 14    The police recovered numerous shell casings on both sides of the victim's car. They recovered six PMC-brand .380 auto cartridge casings, all predominantly in the street alongside or immediately in front of the car. Two of the .380 casings were near the driver's side door toward the rear of the car. Another casing was to the rear of the car, and three additional casings were recovered from the street. A fired bullet was also observed adjacent to the driver's door next to a set of keys. The State's forensic scientist who examined the recovered firearms evidence concluded that the six PMC .380 cartridge casings were all chambered in the same weapon. He was unable to determine whether the shell casings were actually fired from the same weapon because the breech face marks lacked the individual characteristics necessary to make an identification.

¶ 15    Additionally, the police recovered two FC-brand 9-millimeter Luger cartridge casings on the passenger side of the car at the curb area near the front of the victim's car. The State's forensic scientist determined that the two FC 9-millimeter Luger casings were fired from the same weapon. He also testified that the bullet recovered from the crime scene and the two bullets recovered from the autopsy had the class characteristics of a .380 or 9-millimeter bullet with six lands and grooves and a right twist. They could be fired from either a .380 or a 9-millimeter gun. In comparing these bullets, he determined that all three were fired from the same firearm. Finally, assuming that a .357-caliber weapon was used, he testified that he would not expect to find shell casings because .357 handguns are normally revolvers, which do not automatically eject their spent casings.

¶ 16    The police at the scene noted two bullet holes in the overhead door of the garage that faced 72nd Street and was in front of the victim's car. The bullet holes seemed to be new because there was no corrosion or wear and tear in the holes and the dislodged paint chips appeared fresh. The police were unable to locate any spent rounds or fragments inside the garage due to the accumulation of debris. The testimony of police officers and photographs of the scene admitted into evidence showed that shrubbery and trees blocked certain views east and west on 72nd Street.

¶ 17    The postmortem examination of the victim found evidence of five gunshot wounds and additional abrasions or scrapes. One entry wound to the victim's right shoulder involved the heart and abdominal cavity, and a medium-caliber, copper-jacketed bullet was recovered from the muscle beneath the skin. A second entry wound to the victim's left shoulder showed an exit wound from the victim's left upper back. A third entry wound to the victim's lower chest involved the abdomen and showed an exit wound from the musculature of the left back. A second medium-caliber, copper-jacketed bullet was recovered from beneath the skin of the victim's lower back. A fourth entry wound to the palm of the victim's right hand showed an exit wound to the back of the hand. A fifth entry wound on the back of the victim's left hand showed an exit wound on the front of his left forearm. The medical examiner opined that the last two gunshot wounds were defensive injuries. None of the wounds involved close-range firing, *i.e.*, firing from 18 inches or less from the surface of the entry wounds.

¶ 18    The defense presented the alibi testimony of defendant's mother, Audie Jones. She testified that at the time of the offense, defendant lived with her, her husband, and their two children on South Racine Avenue in Chicago. On January 7, 2000, she came home around 11:30 p.m., and all of her children were present in the house when she went to bed at 12:30 a.m.

She slept until 6 a.m. on January 8, 2000, and when she got up, she went to the kitchen and saw defendant in his bed.

¶ 19    On January 30, 2003, the jury found defendant guilty of first degree murder, enhanced by a finding that he personally discharged a firearm during the commission of the offense.

¶ 20    Defendant filed a posttrial motion alleging, *inter alia*, that newly discovered alibi evidence from Anthony and Darryl Thomas, who claimed defendant was at their home at the time of the shooting, mandated a new trial. In signed but unsworn written statements dated March 17, 2003, Anthony and Darryl asserted that on the date in question defendant attended a party in their basement and was asleep at their house at the time the shooting occurred. According to Anthony, defendant slept until either 6 or 7 a.m. on January 8, 2000, but according to Darryl defendant slept until 11 a.m. Darryl claimed that he informed Assistant State's Attorney (ASA) Margaret Wood about this alibi by February 26, 2003. Anthony claimed he talked to the ASA about three times; the first time they spoke, Anthony said defendant "wasn't there so [Anthony was] not going to testify saying that he was."

¶ 21    At the March 2003 hearing on defendant's motion for a new trial, ASA Wood testified that she first spoke with Darryl Thomas on February 28, 2003, well after defendant's trial had concluded. Darryl telephoned her from jail and said defendant was with him at the time of the murder. Although ASA Wood spoke with Anthony Thomas the week prior to the start of defendant's trial, they talked about the gang war between the rival factions and did not talk about defendant specifically. ASA Wood never asked Anthony to testify, and he never said prior to trial that he would not testify. ASA Wood had another conversation with Anthony in her office after defendant's trial in mid-March 2003. On that occasion, Anthony told her for the first time that defendant was drinking with him and Darryl at the time of the murder. After receiving the information from the Thomases, ASA Wood contacted counsel for defendant and codefendant Ashby. The defense did not ask ASA Wood any questions at the hearing, and neither Anthony nor Darryl Thomas testified.

¶ 22    The trial court denied the motion for a new trial. The court found that the Thomases' inconclusive statements would not have affected the jury's verdict and ASA Wood was credible and refuted the defense allegations that the State had knowledge of and withheld any exculpatory evidence. The court sentenced defendant to a term of 24 years' imprisonment for first degree murder with a 20-year enhancement based on the jury's finding that he personally discharged a firearm during the commission of the murder.

¶ 23    On direct appeal, defendant did not challenge the sufficiency of the evidence. Rather, he argued that a portion of his sentence was unconstitutional and should be vacated. This court affirmed his conviction and sentence. *People v. Jones*, No. 1-03-1316 (2004) (unpublished order under Supreme Court Rule 23).

¶ 24                                      B. First Postconviction Petition

¶ 25    In August 2005, defendant filed his first *pro se* petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2004)). Defendant asserted, *inter alia*, claims of actual innocence, newly discovered evidence, prosecutorial misconduct, and ineffective assistance of trial and appellate counsel. The petition included the August 23, 2004, affidavit of codefendant Melvin Jones, which was written about 17 months after Melvin's trial. Melvin averred that he was "solely responsible" for the murder of the victim and falsely accused defendant of being Melvin's accomplice in the shooting. According to the affidavit,

when Melvin was arrested, the police offered him leniency in exchange for information on other people involved in the shooting, and Melvin, to better his circumstances, falsely stated that defendant fired a .357 handgun at the scene. Furthermore, when Melvin had access to a telephone, he contacted his gang members and informed them to instruct defendant to admit to the police to being present at the scene and discharging a .357 handgun. If defendant did not comply, then either he or a close family member would be killed. Melvin averred defendant did not accompany him at the time of the murder and was nowhere in the vicinity. Melvin claimed that he had abandoned his former ways, changed his lifestyle, and could no longer live with the fact that an innocent person was incarcerated for something for which Melvin was responsible. Melvin's affidavit, however, did not state that he was willing to testify consistently with the substance of his affidavit. Defendant argued that Melvin's affidavit exonerated him.

¶ 26   Defendant also attached to his petition two letters he wrote to his parents in 2000. In his March 2000 letter, defendant described the circumstances of his arrest, questioning by police, and confrontation with Melvin's confession. After defendant agreed to take a polygraph test, the polygraph officer said he knew defendant would fail the test and face the death penalty. Because this frightened defendant, he cried and decided to give a false confession similar to Melvin's false statements. Defendant knew "damn well [he] was in the house at the time" of the murder and would not "cop out for some time over" something he did not do.

¶ 27   In defendant's October 2000 letter to his parents, he asserted that even though the police had threatened to beat him if he did not confess his involvement in the murder, the police never touched him physically and no gang member had threatened him "to do it." At the police station, he was scared and weak, did not understand his rights, and essentially "went along" with Melvin's confession after the police showed him Melvin's written and videotaped statements. Defendant asserted that "Devo," *i.e.*, gang leader Leonard Klien, never gave defendant a gun because defendant "was never there when that s*** happen[ed]."

¶ 28   Defendant also attached to his petition the Thomases' unsworn March 2003 statements, which were previously submitted with defendant's motion for a new trial.

¶ 29   The circuit court summarily dismissed defendant's petition as frivolous and patently without merit, and this court affirmed that first-stage postconviction proceeding dismissal, finding that it lacked an arguable basis in fact. *People v. Jones*, 399 Ill. App. 3d 341 (2010). Specifically, this court stated that Melvin's "cleverly drawn" affidavit did not constitute newly discovered evidence, failed to actually inculpate himself, and seemed to acknowledge merely that the events leading to the murder of the victim "were precipitated by the beating [Melvin] suffered in the presence of his girlfriend." *Id.* at 366. This court, mindful that credibility assessments and fact-finding were foreclosed at a first-stage postconviction proceeding, conducted an exhaustive analysis of the many contradictions between the evidence in the record and the incredible factual assertions in support of defendant's actual innocence claim and concluded that the latter " 'taxes the gullibility of the credulous.' " *Id.* at 364 (quoting *People v. Coulson*, 13 Ill. 2d 290, 296 (1958)).

¶ 30                        C. Successive Postconviction Petition

¶ 31   In July 2011, defendant filed a *pro se* motion for leave to file a successive postconviction petition, a *pro se* motion for appointment of counsel, and an accompanying *pro se* petition for postconviction relief. Defendant alleged newly discovered evidence supported his two claims of actual innocence. This newly discovered evidence consisted of (1) the affidavit of Telvin

Shaw and (2) a June 2010 newspaper article about a jury award in a malicious prosecution lawsuit that involved three police officers who were also involved in the Jerry Green murder investigation. Defendant argued that Shaw's affidavit exonerated him and the newspaper article established that defendant's involuntary confession was the product of police misconduct and psychological, mental, and physical coercion.

¶ 32 In his affidavit dated January 21, 2011, Telvin Shaw averred that he was standing in the gangway of a residence at 7200 South Seeley Avenue around 5 a.m. on January 8, 2000. At the time he was affiliated with the same gang faction as Lawrence Green. Shaw had been out all night "hustling." He saw the victim, whom Shaw did not know, exit the backyard of Lawrence's house and walk to his car, which was parked on 72nd Street and faced east toward Damen Avenue. Then Shaw saw someone approach the victim from behind from the alleyway. When the approaching person came closer, Shaw recognized that it was Melvin. Shaw averred that Melvin "stood alone by himself in front of [the victim]" and held a gun in his hand. Suddenly, the victim raised his hands up, and Melvin fired several times until the victim fell to the ground. After Melvin stopped shooting, Shaw did not "continue to look to see where [Melvin] went." Shaw immediately ran home and never told anyone what he had seen.

¶ 33 When Shaw learned that the victim was Lawrence's relative, Shaw wanted to retaliate and collect $5000 by killing Melvin or a member of his faction, but Shaw never had an opportunity to do so. After March 2003, Shaw was incarcerated at Menard Correctional Center and encountered defendant in the prison library in the summer of 2008. They spoke, and Shaw was surprised to learn that defendant had been convicted in this matter. Shaw averred he knew "for a fact that [defendant] did not have any involvement with the murder because 'Melvin' was the only person I seen [*sic*] that night." Shaw came forward to do what he knew was right and was willing to testify to assist defendant in proving his innocence.

¶ 34 The newspaper article, dated June 9, 2010, stated that plaintiff Donny McGee, who previously had been prosecuted for murdering his neighbor but was acquitted based on DNA evidence, received a jury verdict in his favor on his malicious prosecution claim against the city of Chicago, Detectives Edward Farley and Lenihan, and Officer Bartik. McGee alleged that he had refused to confess to the murder, so the police lied about him voluntarily confessing even though there was no written or taped confession and no physical evidence. The jury awarded compensatory damages in the amount of $975,000 against the defendants and punitive damages of $110,000 against each individual defendant. (However, in 2012, this court in *McGee v. City of Chicago*, 2012 IL App (1st) 111084, reversed the circuit court judgment and remanded the matter for a new trial because the circuit court had failed to *voir dire* a juror who did independent research during the trial on the issue of memory lapses.) Attached to the newspaper article was a letter, dated June 10, 2010, to defendant's father from defendant's first postconviction petition counsel. The letter referenced their telephone conversation about the article that morning and gave the contact information for the law firm involved in the malicious prosecution matter.

¶ 35 In May 2012, the circuit court denied defendant leave to file his postconviction petition because he failed to assert a colorable claim of actual innocence. Although the court found that Shaw's affidavit was newly discovered evidence, the affidavit contained the same facts concerning the crime scene that were available in the record. The court found that Shaw's affidavit was not of such a conclusive character that it would likely change the result on retrial. Shaw's assertion that there was only one shooter was rebutted by the evidence, which included

defendant's confession, Odis Deal's testimony that he heard gunfire from two or three weapons, and the two different types of cartridge cases recovered at the scene. Also, the court found defendant's argument about the hearsay newspaper article conclusory and insufficient.

¶ 36 In July 2012, defendant moved the court to reconsider and attached as exhibits to the motion numerous documents and transcripts from the record in this case. Thereafter, defendant amended his motion to argue that the trial court failed to apply the correct legal standard to his motion for leave to file a successive petition alleging claims of actual innocence.

¶ 37 In August 2012, the circuit court denied defendant's motion to reconsider, finding that he failed to present any newly discovered evidence, changes in the law, or errors in the court's prior judgment. Defendant filed a *pro se* motion for leave to file a late notice of appeal, and this court granted the motion and appointed counsel to represent defendant on appeal.

¶ 38 II. ANALYSIS

¶ 39 Defendant argues the trial court erred by denying him leave to file his postconviction petition because he presented a colorable claim of actual innocence based on the newly discovered exculpatory affidavit of Telvin Shaw. Defendant also argues for the first time on appeal that he established cause and prejudice to file his successive postconviction petition because previously unavailable evidence—*i.e.*, three police officers who elicited defendant's confession were found liable in 2010 in an unrelated civil case of fabricating a murder confession—would have supported defendant's claim that his confession was the product of police coercion.

¶ 40 The Act provides a statutory remedy to criminal defendants who claim that substantial violations of their constitutional rights occurred at trial. *People v. Eddmonds*, 143 Ill. 2d 501, 510 (1991). The Act is not a substitute for an appeal but, rather, is a collateral attack on a final judgment. *People v. Ruiz*, 132 Ill. 2d 1, 9 (1989). When, as here, a defendant has previously taken an appeal from a judgment of conviction, the ensuing judgment of the reviewing court will bar, under the doctrine of *res judicata*, postconviction review of all issues actually decided by the reviewing court, and any other claims that could have been presented to the reviewing court will be deemed waived. *People v. Neal*, 142 Ill. 2d 140, 146 (1990).

¶ 41 Successive postconviction petitions are disfavored under the Act. *People v. Edwards*, 2012 IL 111711, ¶ 29. The Act provides that any claim of substantial denial of constitutional rights not raised in the original or amended petition is subject to the doctrines of *res judicata* and waiver. 725 ILCS 5/122-3 (West 2010); *People v. Smith*, 341 Ill. App. 3d 530, 535 (2003). However, the waiver provision can be lifted, and a successive petition can be considered on the merits if it either meets the cause and prejudice test of section 122-1(f) of Act (725 ILCS 5/122-1(f) (West 2010)) or its consideration is necessary to prevent a fundamental miscarriage of justice because the defendant shows a claim of actual innocence. *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002). A defendant seeking to institute a successive postconviction proceeding through the filing of a successive postconviction petition must first obtain leave of court. *People v. Tidwell*, 236 Ill. 2d 150, 157 (2010).

¶ 42 A. Claim of Actual Innocence—Shaw's Affidavit

¶ 43 Where, as here, a defendant's successive petition makes a claim of actual innocence, such a claim may only be considered if the evidence in support of the claim was newly discovered,

material to the issue and not merely cumulative of other trial evidence, and of such a conclusive character that it probably would change the result on retrial. *People v. Ortiz*, 235 Ill. 2d 319, 333-34 (2009). Newly discovered evidence is defined as evidence that has been discovered since the trial and could not have been discovered sooner by the defendant through due diligence. *Id.* at 334. Material evidence is relevant and probative of the defendant's innocence (*People v. Coleman*, 2013 IL 113307, ¶ 96), but evidence is considered cumulative when it adds nothing to what was already before the jury (*Ortiz*, 235 Ill. 2d at 335).

¶ 44    The United States Supreme Court has emphasized that claims of actual innocence must be supported "with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Claims of actual innocence are rarely successful because such evidence is obviously unavailable in the vast majority of cases. *Id.*

¶ 45    Requests to file successive petitions are reviewed under a higher standard than the first-stage standard for initial postconviction petitions, which is simply a determination of whether the petition is frivolous or patently without merit. *People v. Smith*, 2014 IL 115946, ¶ 35; *Edwards*, 2012 IL 111711, ¶¶ 25-29. To set forth a colorable claim of actual innocence in a successive petition, the defendant's "request for leave of court and his supporting documentation must raise the probability that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Edwards*, 2012 IL 111711, ¶ 31. The defendant has the burden to obtain leave of court and also must submit enough in the way of documentation to allow a circuit court to make that determination. *Id.* ¶ 24. "This is so under either [the] *** cause and prejudice or actual innocence [exception to the bar against successive postconviction proceedings]." *Id.* "[L]eave of court to file a successive postconviction petition should be denied when it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *Smith*, 2014 IL 115946, ¶ 35. Although decisions granting or denying leave of court generally are reviewed for an abuse of discretion, a trial court's determination that a petitioner has failed as a matter of law to assert a colorable claim of actual innocence suggests *de novo* review. *Edwards*, 2012 IL 111711, ¶ 30. Just as our supreme court did not decide this question in *Edwards*, we need not determine this issue in this case because defendant's claim of actual innocence fails under either standard of review, since his supporting documentation is too insufficient to justify further proceedings. See *id.*

¶ 46    Defendant argues the circuit court erroneously denied him leave to file his successive petition because Shaw's affidavit represents the only eyewitness account of the victim's murder and states a colorable claim of actual innocence. We disagree. Although Shaw avers that Melvin "stood alone by himself in front of [the victim]" and Melvin "was the only person I seen [*sic*] that night," Shaw critically does not assert that defendant was not present when the shooting took place. Even if Shaw's affidavit is considered newly discovered, material, and not cumulative, it does not raise the probability that, in the light of the new evidence, it is more likely than not that no reasonable juror would have convicted defendant. "This evidence is not 'of such conclusive character that it would probably change the result on retrial' [citation]." *Id.* ¶ 40.

¶ 47    In his initial postconviction petition, defendant already presented the theory that his convicted codefendant Melvin Jones was the only shooter, and this court found that claim of defendant's actual innocence "indisputably meritless" and rejected the notion that Melvin's affidavit was of such conclusive character that it would probably have changed the result on retrial. *Jones*, 399 Ill. App. 3d at 366-67. This court noted that Melvin's affidavit was "cleverly drawn" and failed to actually inculpate himself; his statement that he was "solely responsible" for the victim's murder was "a meaningless assemblage of words" and merely seemed to acknowledge the fact that Melvin's humiliating beating in the presence of his girlfriend by members of the rival street gang faction precipitated the events that resulted in the victim's murder. *Id.* at 366.

¶ 48    This court, in reaching its ultimate conclusion that defendant's initial postconviction actual innocence claim lacked an arguable basis in law and fact, conducted an exhaustive analysis of the many contradictions between the record and the theory that Melvin was the sole shooter, including the fact that defendant's postarrest actions—*i.e.*, persistently proclaiming his innocence to three different teams of detectives for over 12 hours—failed to coincide with the postconviction claim that Melvin coerced defendant to incriminate himself. *Id.* at 360-63. Moreover, when defendant finally did confess, he offered (contrary to any alleged instruction from Melvin) a detailed explanation of the shooting that highlighted Melvin's involvement, minimized defendant's own participation, and added substantial accusatory details of Ashby's participation. *Id.*

¶ 49    The deficiencies of Melvin's "cleverly drawn" affidavit from the initial postconviction petition proceeding reverberate in Shaw's similarly cleverly drawn affidavit before this court in this successive petition. Shaw admits that he was at the scene "hustling," presumably selling drugs, and never states that the scene was deserted except for the presence of himself, the victim, and Melvin. Shaw's affidavit indicates merely that Melvin and the victim were the only people Shaw observed from his distant vantage point in a gangway between two houses on the west side of the 7200 block of South Seeley Avenue, which was neither parallel to, opposite from, nor catercorner to the shooting. Specifically, Shaw avers merely that Melvin "stood alone by himself in front of [the victim]" and held a gun in his hand. Melvin fired several times until the victim fell to the ground. After Melvin stopped shooting, Shaw did not "continue to look to see where [Melvin] went," and Shaw immediately ran home.

¶ 50    Shaw does not state he could see from his vantage point that defendant was not present at the scene, and Shaw's affidavit does not contradict the facts contained in defendant's statements to the detectives and videotaped confession. Specifically, defendant admitted that he, Ashby, and Melvin hid in two separate locations outside Lawrence Green's home and Melvin emerged from the alley first, walked up to the victim, and stood about two feet in front of him. Melvin confronted the victim and swore at him. Meanwhile, Ashby and defendant emerged from their hiding places to help Melvin surround the victim. Neither Ashby nor defendant stood in front of or near the victim or spoke to him. See *Edwards*, 2012 IL 111711, ¶ 39 (although the codefendant's affidavit averred that the defendant was neither a part of nor took part in the shooting, the codefendant critically failed to assert that the defendant was not present when the shooting took place and, thus, did not establish a colorable claim of actual innocence where the defendant was convicted of the murder under the theory of accountability).

¶ 51    Moreover, Shaw's affidavit is devoid of any details indicating that his view of the crime scene from the gangway was clear, unobstructed, and wide enough to refute the likelihood that Ashby and defendant, who initially were hiding while they waited in enemy territory and then stood several feet away from Melvin at the time of the shooting, were not within the scope of Shaw's limited view. It would have been dark at 5 a.m. in January, and photographs admitted into evidence and the testimony of police officers at the scene established that shrubbery blocked certain views east and west on 72nd Street. In addition, Shaw admitted that he stopped looking and ran after Melvin stopped shooting. Accordingly, Shaw, in addition to missing the sight of Melvin running east toward Damen Avenue, also would have missed the sight of defendant and Ashby firing their guns or disappearing south down the alley toward 73rd Street.

¶ 52    The dissent, in order to reach its desired conclusion that Shaw avers he saw Melvin Jones alone at the scene, must excise from Shaw's affidavit all the qualifying language about what Shaw allegedly saw concerning Melvin at the scene. It is a simple enough undertaking for an eyewitness affiant to state that he had a clear view of the crime scene and the defendant was not present when the affiant observed a lone assailant shoot the victim. Shaw, however, chose to qualify his statement to aver merely that "Melvin stood alone by himself in front of [the victim]" and "Melvin was the only person [Shaw had] seen that night." The plain language of Shaw's affidavit does not exonerate defendant, and this court should not ignore this deficiency or attempt to improve upon a defendant's successive petition to help him meet the already low threshold to obtain leave to file a successive petition. Also, contrary to the dissent's assertion that Shaw made himself unavailable as a witness when he moved to California in January 2000, Shaw himself admitted that he had returned to his same neighborhood in Chicago by February 2001.

¶ 53    Furthermore, the evidence at trial established that there was more than one shooter and at least two firearms were used. Odis Deal, who lived at the corner of 72nd Street and Damen Avenue, testified that he heard two to three gunshots followed by a volley of eight or nine gunshots. There was no pause between the gunshots; they all happened together. Deal had been in the army and had heard gunfire before. He stated that the first two to three gunshots sounded different from the rest, as if they were coming from two or three different guns. Similarly, Curtis Moore testified that he was at home, inside 7159 S. Seeley Avenue, and on the telephone at the time of the shooting. The victim had just left the house, and then Moore heard 5 to 10 gunshots. Although some gunshots sounded loud like they were right next to Moore's window, other gunshots did not sound as loud, which indicated that the gunshots were fired from different guns at different locations.

¶ 54    The physical evidence also established that there was more than one shooter. Cartridge casings were recovered from both the street and curb sides of the victim's parked car. Furthermore, two different types of cartridge casings were recovered from the scene. Although the State's forensic scientist was unable to state whether the six .380 casings had been fired from one weapon, he was able to determine that the two 9-millimeter casings, which were recovered on the curb side of the victim's car, were indeed fired from the same firearm. This physical evidence was consistent with defendant's statements to the police that he had fired two shots from a .357 revolver, Ashby had fired three to four shots from either a 9-millimeter or a ".45," and Melvin had fired six to seven shots from a .380 semiautomatic pistol. The absence of any recovered .357 ammunition from the crime scene corroborated defendant's confession because spent cartridges must be ejected manually from a revolver. In addition to

- 11 -

the numerous shell casings recovered on both the street and curb sides of the victim's car, the police also found two fresh bullet holes in the overhead door of the garage that faced 72nd Street and was alongside and just east of the victim's parked car.

¶ 55 Additional support for the fact that more than one shooter attacked the victim is found in the testimony that the victim died of multiple gunshot wounds, and none of the wounds involved close-range firing, *i.e.*, firing from 18 inches or less from the surface of the entry wound. The State's medical examiner found evidence of five gunshot wounds to the victim, and the entry wounds were on different sides of his body and had varied angles or trajectories. For example, one entry wound on the victim's right shoulder included the heart and abdominal cavity, whereas another entry wound on the victim's left shoulder exited his left upper back. The other wounds showed an entry at the victim's lower chest with an exit from the musculature of the left back, an entry at the palm of the victim's right hand with an exit to the back of the hand, and an entry at the back of the victim's left hand with an exit to the front of the left forearm.

¶ 56 Defendant cites *People v. Harper*, 2013 IL App (1st) 102181, ¶ 52, where the court found that even though some of the physical evidence corroborated the defendant's confession, another witness's recantation of his trial testimony supported the defendant's claim that his confession was coerced by the police and such evidence would likely have changed the outcome of the case. *Harper*, however, is distinguishable from the present case. Defendant Harper confessed to setting a fire that killed two people. *Id.* ¶¶ 7-8. After his conviction, Harper petitioned for postconviction relief, submitting the affidavit of a man who admitted to starting the fire, as well as an affidavit from a trial witness who recanted his testimony. *Id.* ¶¶ 23-25. This court found the affidavits to be newly discovered evidence that was material and likely to change the result on retrial. *Id.* ¶ 52. Here, the affidavit at issue is neither a recantation of trial testimony nor an admission of guilt on the part of the culpable party. Shaw's affidavit merely repeats the underlying theory of defendant's initial postconviction petition and Melvin's cleverly drawn affidavit: that Melvin was the sole gunman. *Harper* would be more pertinent to an innocence claim based on Melvin's affidavit, in which he claimed to be solely responsible for the murder. This court, however, has already determined that the sole gunman theory lacks merit. *Jones*, 399 Ill. App. 3d at 367.

¶ 57 We conclude the circuit court properly denied defendant leave to file a successive petition based on Shaw's affidavit because it does not raise the probability that it is more likely than not that no reasonable juror would have convicted defendant.

¶ 58 B. Cause and Prejudice Test—Newspaper Article

¶ 59 Next, defendant argues, for the first time on appeal, that the circuit court erroneously denied him leave to file his successive petition because he established cause and prejudice to file the petition based on a June 9, 2010, newspaper article about the jury verdict and award in the Donny McGee malicious prosecution lawsuit against the city of Chicago, Detectives Farley and Lenihan, and Officer Bartik. Defendant's new cause-and-prejudice argument on appeal differs from his argument before the circuit court, which alleged he had presented a colorable claim of actual innocence based upon this newspaper article.

¶ 60 Allegations not raised in the postconviction petition cannot be considered on appeal. *People v. Jones*, 211 Ill. 2d 140, 148 (2004); *People v. Smith*, 352 Ill. App. 3d 1095, 1112 (2004); *People v. Griffin*, 321 Ill. App. 3d 425, 428 (2001) (the Act does not permit a defendant

- 12 -

to raise an issue on appeal from the dismissal of a postconviction petition that he never raised in the petition). Defendant has abandoned on appeal his claim of actual innocence concerning this newspaper article, and his new cause-and-prejudice theory on appeal is improper and will not be considered by this court as part of his motion for leave to file his successive petition.

¶ 61                                  III. CONCLUSION

¶ 62     The dissent's assertion that defendant should be allowed to file his successive petition relies on numerous inaccurate propositions and distortions of the record, including that (1) Shaw's affidavit *exonerates* defendant; (2) codefendant Melvin Jones's recycled affidavit from defendant's unsuccessful actual innocence claim of his initial postconviction petition *somehow exonerates* defendant this time around; (3) the State somehow *withheld from defendant knowledge of one of his own alibis—i.e.*, that at the time of the murder he was asleep at the home of his friends Darryl and Anthony Thomas, which of course is inconsistent with the alibi trial testimony of defendant's mother that he was asleep at her home; (4) Odis Deal claimed he could distinguish gunshots from different firearms based on his army experience 30 years ago; (5) defendant is connected to this murder only by his confession; (6) the physical evidence does not corroborate his confession; (7) his coercion claims concerning his confession have been *consistent* even though defendant initially told his parents in a letter in 2000 that the police never touched him physically and no gang member threatened him to confess, then defendant unsuccessfully sought to suppress his confession by claiming that Officer Bartik pushed, shoved, and punched him while two other officers looked on, then defendant never challenged on direct appeal the denial of his motion to suppress his confession, and defendant later argued in his initial postconviction petition that his involuntary confession resulted from coercion from members of his street gang; (8) this court has jurisdiction to review defendant's cause-and-prejudice claim about police misconduct and coercion to obtain his confession even though he did not raise a cause and prejudice claim before the circuit court; (9) evidence from a newspaper article about a civil case that involved claims of police misconduct supports defendant's claim of actual innocence even though defendant has abandoned that particular claim on appeal; and (10) this court made credibility determinations, engaged in fact-finding, and applied the second-stage substantial showing standard in reviewing defendant's request for leave to file his successive petition.

¶ 63     The parties here well know the nature of the evidence presented at the trial and the documents submitted in support of defendant's postconviction petitions. This evidence and these documents are accurately and fairly summarized in both this opinion and the 2010 opinion affirming the summary dismissal of defendant's first postconviction petition. *Jones*, 399 Ill. App. 3d 341. Our role on review is to determine whether the circuit court erred in denying defendant leave to file a successive petition; this review is not an instrument to collaterally attack this court's past determinations, particularly where the documentation presented would in no way have changed the result on retrial. It is thus exceedingly inappropriate for the dissent to delve into the credibility of defendant's confession, the credibility of the trial testimony of Odis Deal and Curtis Moore, as well as the history of other court proceedings against a particular officer. Defendant's agreement to make a videotaped statement was documented both in writing and on the videotape. Also, the recording shows a calm and cooperative defendant giving an articulate, intelligent, and detailed narrative statement and confessing to his participation in the murder. Defendant does not appear

disheveled, stressed, or tired. No marks, bruises, or injuries are visible on defendant, and he makes no claim in his successive petition regarding any such injuries. Furthermore, as discussed above, the physical evidence concerning the location and type of ammunition recovered at the scene, the victim's wounds, the testimony of Lawrence Green concerning the motive for the shooting, and the testimony of witnesses Deal and Moore corroborated the details in defendant's confession.

¶ 64    Finally, we are compelled to comment on the dissent's egregious use of *People v. Tyler*, 2015 IL App (1st) 123470, to attack Detective Lenihan in this case. See *infra* ¶¶ 86, 167. The dissent's misleading citations and parentheticals to *Tyler* insinuate that the allegations in that case of police misconduct and physical coercion to obtain the defendant's confession included misconduct and coercion claims against Lenihan. That insinuation, however, is absolutely false.

¶ 65    For the above reasons, we affirm the circuit court's denial of defendant's motion for leave to file a successive petition.

¶ 66    Affirmed.

¶ 67    JUSTICE GORDON, dissenting:

¶ 68    All that is at stake in this appeal is whether defendant may even file his postconviction petition. If we grant him leave to file, then he still faces the hurdles of second-stage and third-stage proceedings.

¶ 69    The threshold at this point is pretty low. If his petition advances to the second stage, he will *then* have to make a substantial showing. But at this point, we are not even at the "substantial showing" stage. As I discuss below, the probability required now is *less than* the substantial showing that will be required *later* at the second stage.

¶ 70    The question is: "did petitioner's request for leave of court and his supporting documentation *raise the probability* that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence?" (Emphasis added.) *Edwards*, 2012 IL 111711, ¶ 31.

¶ 71    Defendant has consistently protested his innocence during pretrial, trial, and posttrial proceedings: first moving to suppress his confession as involuntary prior to trial, then presenting an alibi defense during trial, and next moving for a new trial when the prosecutor disclosed two exculpatory witnesses after the trial ended.

¶ 72    As I explain in more detail below, the only evidence connecting defendant to this murder was his own confession, which he has consistently claimed was coerced and which is not corroborated by some of the physical evidence.

¶ 73    Now, Telvin Shaw, who is the only known eyewitness to the murder, has come forward to completely exonerate defendant. The trial court held that Shaw's affidavit was newly discovered, and the trial court did not find that it lacked materiality or was merely cumulative. The trial court also found that Shaw's affidavit comported in almost all respects with the trial record.[1] In addition to eyewitness Telvin Shaw, whose affidavit defendant now offers, there

---

[1]The majority agrees with the trial court that Shaw's affidavit comported in almost all respects with the trial record. Although there is no evidence to suggest that Shaw had access to the trial record, the

are also two alibi witnesses *who were discovered by the prosecutor* but not revealed by the State until after the trial.

¶ 74 The evidence available now that was not available at trial includes (1) the affidavit of a newly discovered eyewitness, Telvin Shaw; (2) the affidavit of the sole shooter; Melvin Jones; (3) the statements of the two alibi witnesses disclosed by the State after the trial, Darryl and Anthony Thomas; and (4) information concerning similar misconduct by the same police officers who obtained defendant's confession.

¶ 75 In its petition for rehearing, the State repeats the points it made in its initial briefs and echoes Justice Lampkin's former dissent and now current majority opinion. Both focus on the factual question of whether there were one or two shooters. *Supra* ¶¶ 53-55. However, the evidence that is now available, which was not available at trial, more than "raise[s] the probability" that—whether there were one or two shooters—defendant was simply not there.[2] *Edwards*, 2012 IL 111711, ¶ 31. I believe that the majority and the State are both holding defendant to the higher "substantial showing" standard that is simply not appropriate at this stage. Any credibility issues concerning Shaw's statement that Melvin Jones, the shooter, was "alone" would have to be resolved at a third-stage evidentiary hearing, not now. Any credibility determinations would be premature at this stage in the proceedings.

¶ 76 In sum, there were no eyewitnesses at trial, no physical evidence linking defendant to the murder, and no arrest of defendant at the scene. The only evidence linking defendant to the offense was his own confession, which he alleges was coerced. Now, for the first time, we have an eyewitness. Defendant deserves leave to file his petition and the opportunity to *later* make a substantial showing at the second stage. This defendant may be an innocent man. I would permit the trial court to take a second look here.

¶ 77 Since there is no more important question than whether an actually innocent man is in prison, I discuss in detail below the relevant facts and law.

¶ 78                              BACKGROUND
¶ 79                          I. Procedural History
¶ 80 Defendant was 19 years old when he was charged with first degree murder for the shooting death of Jerry Green, which occurred at approximately 5 a.m. on January 8, 2000. Prior to trial, defendant moved to suppress his confession on the grounds that Officer Robert Bartik, a polygraph examiner, had physically pushed, punched, and shoved defendant while two other officers watched and that defendant was also subjected to psychological and mental coercion.[3] Detective Robert Lenihan testified at a suppression hearing that defendant agreed to a

---

majority observes that his "affidavit contained the same facts concerning the crime scene" as were in the trial record. *Supra* ¶ 35.

[2]Justice Howse made this same point in his dissent, when he dissented from the dismissal of defendant's first postconviction petition. *People v. Jones*, 399 Ill. App. 3d 341, 375 (2010).

[3]Defendant's pretest interview by Officer Bartik and ensuing interview by Detectives Robert Lenihan and Edward Farley were not recorded, since they occurred a year and a half before Illinois law started requiring the electronic recording of all custodial interrogations in homicide cases. Pub. Act 93-206, § 25 (eff. July 18, 2005) (adding 725 ILCS 5/103-2.1).

polygraph examination but then confessed during the pretest interview[4] with the examiner. Defendant's suppression motion was denied, and at trial, defendant presented an alibi defense, calling his mother, who testified that she observed defendant at home sleeping at 6 a.m.

¶ 81    The jury found defendant guilty of both first degree murder and personally discharging a firearm during the offense. After the jury's verdict but prior to sentencing, the prosecutor contacted defendant, through his counsel, to notify him that two witnesses, Darryl and Anthony Thomas, had separately informed her after trial that defendant was with them at the time of the murder and thus not at the crime scene. The trial court rejected defendant's motion seeking a new trial based on the statements of these two witnesses, in part because their statements were unsworn.[5]

¶ 82    The trial court sentenced defendant to 44 years with the Illinois Department of Corrections (IDOC), which included 24 years for first degree murder and 20 years for personally discharging a firearm during the commission of the offense. On direct appeal, defendant challenged only the constitutionality of his 20-year sentence for personally discharging a firearm (730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2000)), and this court affirmed his conviction and sentence in *People v. Jones*, No. 1-03-1316 (2004) (unpublished order under Supreme Court Rule 23).

¶ 83    In 2005, defendant filed his first postconviction petition in which he again asserted his innocence and included an affidavit from one of his codefendants, Melvin Jones,[6] who averred that Jones had committed the murder alone and that defendant was neither involved nor present during the shooting. Defendant also included letters he wrote to his parents on March 25, 2000, and October 3, 2000, in which he stated that the police officers threatened to beat him but did not, and that the polygraph examiner coerced him into confessing.

¶ 84    Concerning the police officers, defendant stated in his letter, dated October 3, 2000: "Was I threaten by the cops? Yes, they said they would beat me if I wouldn't say I was involved in the murder. *** No they did not touch me physically? (the cops)." Concerning the polygraph examiner, defendant stated in his letter, dated March 25, 2000, that first the police officers showed him Jones's confession and that, after defendant denied involvement, they asked him if he wanted to take a polygraph examination. Defendant stated: "the two officers ask me did I want to take a lie detector test, I said yes. They took me to 11th & State and I sat in a room with a polygraph for about five to ten minutes as the officers talked with the polygram [*sic*] officer. The polygram officer came in the room asking me the same shit about the murder. I told him too, I didn't have shit to do with it. He told me I would face the death penalty if I take the test

---

[4]The Illinois Administrative Code requires a polygraph examiner to conduct a "pre-test interview" in which (1) the examiner must inform the subject of each issue to be covered during the test; (2) the examiner must reduce to writing every question that will be asked, must read them to the subject, and must record the subject's answers in writing; and (3) the examiner must inform the subject that taking the test is voluntary and must obtain the subject's consent. 68 Ill. Adm. Code 1230.90 (2005). These requirements have applied since at least 1998. 68 Ill. Adm. Code 1230.90, amended at 22 Ill. Reg. 10567 (eff. June 1, 1998).

[5]These statements were later included as exhibits to defendant's motion to reconsider the trial court's denial of leave to file his successive postconviction petition.

[6]Since Melvin Jones shares the same last name as defendant, I refer to Melvin Jones as "Jones" and defendant as simply defendant throughout this dissent.

because he knew for a fact I would fail as if *it was set up for me to fail*. So know [*sic*] I'm frightened and nervous and I bowed my head then burst out in tears because I knew I was about to lie on myself, that's when I confessed and went along with a made up story similar to Melvin's." (Emphasis added.) At the end of the letter, defendant asked his parents not to "worry yourselves."

¶ 85    The trial court dismissed defendant's petition at the first stage, and this court affirmed in *Jones*, 399 Ill. App. 3d at 373, with Justice Howse dissenting.[7]

¶ 86    On July 26, 2011, defendant moved for leave to file a successive postconviction petition, again asserting his innocence and including (1) an affidavit from Telvin Shaw, an eyewitness to the murder, who stated that defendant was not present and Jones was the sole shooter, and (2) a newspaper article, which stated that the three police officers who had obtained defendant's confession were ordered to pay $110,000 each in punitive damages, after a jury found that they had fabricated a confession in a murder case. See *McGee v. City of Chicago*, 2012 IL App (1st) 111084, ¶¶ 1-4 (a jury awarded a criminal defendant damages for malicious prosecution by Officer Robert Bartik and Detectives Robert Lenihan and Edward Farley, but the appellate court reversed and granted a new trial due to Internet research by a juror);[8] see also *People v. Tyler*, 2015 IL App (1st) 123470, ¶¶ 4, 21 (this court reversed the dismissal of the defendant's postconviction petition and remanded for a hearing on defendant's coerced confession claim where the initial confession was obtained during a 45-minute interview with Detective Lenihan).

¶ 87    It is the trial court's denial of defendant's motion for leave to file his second postconviction petition that is at issue before us.

¶ 88                              II. The Evidence at Trial

¶ 89    In sum, there were no eyewitnesses at trial, no physical evidence linking defendant to the murder, and no arrest of defendant at the scene. The only evidence linking defendant to the offense was his own videotaped confession.

¶ 90    The evidence at trial established that the victim, Jerry Green, was at a bar with his friend, Curtis Moore, the night before the shooting. Moore testified that Jerry Green was often referred to as "Old Baby." After the two men left the bar, they drove to Moore's home, where Jerry Green parked his vehicle. Moore lived with his fiancée, Yolanda Green, a relation of Jerry Green, and Moore and Yolanda lived there with other members of Yolanda's family. At

---

[7]Writing about the prior opinion in this case, the majority states that the prior panel was "mindful that credibility assessments and fact-finding were foreclosed at a first-stage postconviction proceeding." S*upra* ¶ 29. However, Justice Howse in his dissent castigated the majority for *not* being mindful of just this point. He decried "the majority's thinly veiled credibility determination" and reminded the majority that "[a]ny direct challenge to *** credibility is premature at this stage of review." *Jones*, 399 Ill. App. 3d at 375-76 (Howse, J., dissenting).

[8]A civil jury awarded a total of $1.3 million to McGee in damages, but the case was appealed and remanded for a new trial, after Internet research by a juror. In 2014, the City of Chicago settled the McGee case for $870,000, thereby avoiding a new trial and any admission of wrongdoing by the City. Hal Dardick & Duaa Eldeib, *Chicago Aldermen OK $6.6 Million to Settle Lawsuits*, Chi. Trib. (Mar. 31, 2014), *available at* http://articles.chicagotribune.com/2014-03-31/news/chi-chicago-aldermen-ok-66-million-to-settle-lawsuits-20140331_1_leslie-darling-new-trial-city-attorney.

- 17 -

approximately 5 a.m., Jerry Green exited the house and was shot multiple times near his vehicle. Moore testified that some gunshots sounded louder than others. After hearing multiple gunshots and then looking out a window, Moore went outside. He did not, however, observe who shot Jerry Green, and he did not observe anyone running from the scene.

¶ 91    Lawrence Green testified that he resided at the same house as Curtis Moore and Yolanda, that he was the leader of the No Limits faction of the Gangster Disciples street gang, and that his nickname was "Motor." Lawrence Green testified that there was a conflict between the No Limits and Third Ward factions of the Gangster Disciples street gang.

¶ 92    Two forensic investigators testified that they collected six .380 cartridge casings, a fired bullet, and two 9-millimeter cartridge casings from the scene. In addition, the medical examiner testified that two bullets were recovered from the body of Jerry Green, who had died from multiple gunshot wounds. None of the wounds sustained by Green involved close-range firing, which is firing from 18 inches or less away. The medical examiner testified that two of the gunshot wounds, which indicated that bullets travelled through the victim's hands, were defensive injuries, which generally occur when a victim raises his hands in an effort to defend himself.

¶ 93    A firearms expert testified that all the cartridge cases and bullets recovered from the scene and the body were a .380 caliber or a 9-millimeter caliber and that .380/9-millimeter bullets can be fired from either a .380-caliber or 9-millimeter gun.

¶ 94    The firearms expert testified (1) that the six .380 auto fired cartridge cases recovered from the scene were all chambered in the same firearm but he could not tell whether they were fired from the same gun, (2) that the two 9-millimeter cartridge cases were fired from the same gun, (3) that a bullet recovered from the scene was fired from the same gun as the two bullets removed from decedent's body, and (4) that these three bullets could have been fired from either a .380-caliber or 9-millimeter gun. The firearms expert did not testify and was not asked whether it was possible that all the cases and bullets were fired from one gun.

¶ 95    Odis Deal, a neighbor, testified that he heard gunshots at about 5 a.m., first two to three gunshots, followed by a volley of eight or nine more shots. Deal had been in the army almost 30 years ago and, to him, the shots sounded like they were coming from two or three different types of firearms. However, he was not asked whether the sound of two different types of cartridges being fired from the same handgun would sound the same.

¶ 96    Detective Robert Lenihan testified that, after speaking with Lawrence Green, the officers began looking for Melvin Jones and that, after speaking with Melvin Jones, they began looking for defendant.

¶ 97    After defendant was taken into custody on March 3, 2000, he denied any involvement with the shooting, first to Detective Timothy Nolan and then to Detective Michael Rose.

¶ 98    Although not part of the trial evidence, at the hearing on defendant's suppression motion, Detective Lenihan testified that defendant agreed to a polygraph test and was transported to the facility at 11th and State Streets. During the pretest interview with Officer Bartik, defendant first made admissions that he then repeated to Detectives Lenihan and Farley on his return to area one.

- 18 -

¶ 99 At trial, Detective Lenihan testified that the detectives then contacted the State's Attorney's office, and defendant's confession was videotaped.[9] During the videotaped confession, defendant confirmed that there was a conflict between the Third Ward and the No Limits factions and that he was a member of the Third Ward faction. Defendant stated that he, Melvin Jones, and Travis Ashby went to Lawrence Green's home and they would have shot Lawrence Green ("Motor") if he had appeared. When Jerry Green ("Old Baby") exited the house, they fired at him. Jones discharged his weapon first, firing six or seven gunshots at Old Baby. Ashby fired two to three gunshots, and defendant fired two gunshots. Defendant had a .357-caliber handgun, Ashby had either a .45 or 9-millimeter handgun, and Jones had a .380-caliber semiautomatic weapon.

¶ 100 Defendant presented an alibi defense, calling his mother, who testified that she observed him sleeping at home at 6 a.m. on the day of the shooting. As described above, the jury convicted him of first degree murder and personally discharging a firearm, and he was sentenced to 44 years with IDOC.

¶ 101 III. Postconviction Petition at Issue

¶ 102 The postconviction petition at issue in this appeal is defendant's second petition, and it was filed on July 26, 2011. The *pro se* petition alleges that his confession was involuntary and the product of police misconduct and coercion by Officer Robert Bartik and Detectives Robert Lenihan and Edward Farley.

¶ 103 Along with the *pro se* petition, defendant filed a *pro se* motion for leave to file a successive postconviction petition, a *pro se* motion for appointment of counsel, and documents including (1) an affidavit from eyewitness Telvin Shaw, (2) a letter from an assistant public defender (APD), dated June 10, 2010, and (3) a Chicago Tribune newspaper article written by Duaa Eldeib, dated June 9, 2010.

¶ 104 Defendant alleges in his *pro se* petition that the article and the APD's letter were both written after his first petition was dismissed. His initial postconviction petition was filed on August 30, 2005, and summarily dismissed on October 11, 2006.

¶ 105 Defendant also alleges that Shaw "essentially made himself unavailable as a witness when he moved to California shortly after the murder, and did not admit to having witnessed the incident until more than 5 years" after defendant's trial. In addition, if defendant was not present at the scene of the murder as he alleged, then he would not know who was present.

¶ 106 The APD's letter, dated June 10, 2010, and addressed to defendant's father, stated that Bartik, Lenihan, and Farley were all named in an attached Tribune article. The June 9, 2010, article stated that the three officers were ordered to pay $110,000 each in punitive damages, after a jury found that they had fabricated a confession in a murder case where there had been no physical evidence linking the defendant to the crime. See *McGee*, 2012 IL App (1st) 111084, ¶¶ 1-4 (a jury awarded damages for malicious prosecution by Officer Robert Bartik, Detective Robert Lenihan, and Detective Edward Farley, but the appellate court reversed and granted a new trial because a juror had performed Internet research).

---

[9]In the videotaped confession, defendant sat behind a table, wearing a jacket with a high collar, so that only his face was visible. He sat leaning slightly forward and he remained almost perfectly still during most of the 18-minute tape, with his arms under the table. From the couple of times that he shifted his hands, it appeared that his arms were folded across and hugging his torso.

¶ 107        Telvin Shaw stated in a notarized affidavit,[10] dated January 21, 2011:

"I Telvin Shaw, do hereby declare and affirm that foregoing information within this affidavit is true and correct in substance and in part:

On the late night of January 7th, 2000 into the early morning hours of January 8th, 2000 around 5:00 am, I Telvin Shaw was standing in the gangway of the residence at [a certain street address]. At the time, I was affiliated with the No Limited [*sic*] faction of the GD. whom Lawrence Green a.k.a. 'Motor' was the leader of.

On this particular morning, I had been out all night hustling. While standing in the ganeway [*sic*] of this residence, I observed an individual, a male whom I didn't know at the time leave out of the back yard of 'Motor's' house walking out into 72nd Street towards a parked grey-colored Chevy vehicle that was facing Damen Street.

While this individual was opening his car door someone approached him from behind from the alleyway, as the assailant got closer to this individual, I clearly notice[d] that the assailant was a guy named 'Melvin', a well known member of the Third Ward faction of the GD.

Melvin stood alone by himself in front of this individual holding a gun in his hand. Suddenly, I saw this person raise his hands up and 'Melvin' began shooting him several times until he fell to the ground. After 'Melvin' stopped shooting, I didn't continue to look to see where he went. I immediately ran home and never told anyone what I witness.

I later learn that this guy that I saw 'Melvin' shoot down had died and that he was related to 'Motor'. I then sought revenge for 'Motor' by looking to make an attempt on 'Melvin's' life so I could try and collect the $5,000 dollars that 'Motor' had offered to kill any Third Ward member. However, I never got the opportunity to encounter 'Melvin' afterwards and I never collected any money from 'Motor.'

Thereafter, people made several attempts on my life which force me to move to California in late January of the year 2000. I returned back to the southside of Chicago in my same neighborhood in February 2001. In March of 2003 I was charged with an offense that eventually landed me in I.D.O.C. at Menard Correctional Center. While incarcerated at Menoard [*sic*] I encountered 'Anteleto Jones' in the prison[']s law library in the summer of 2008.

After having a conversation with 'Anteleto Jones', to my surprise, I learn[ed] that he (Anteleto Jones) was incarcerated for a murder that I knew for a fact that he (Anteleto) was innocent of. I also learned after having the conversation with Anteleto Jones that he was charged and convicted as 'Melvin's' co-defendant for allegedly participating in the murder on the morning of January 8th, 2000. I know for a fact that Anteleto did not have any involvement with the murder because 'Melvin' was the only person I seen that night.

I feel the need to do what I know is right by coming forward with an accurate and truthful account of what actually occurred on the morning of January 8th, 2000. I am making this affidavit of my own free will and I would be willing to come forwarded

_____

[10]The majority accuses the dissent of "excis[ing] from Shaw's affidavit" to reach a desired result. *Supra* ¶ 52. I quote Shaw's affidavit here in full.

[*sic*] to testify to the contents herein to further assist Anteleto Jones in proving his innocence."

Shaw states in his affidavit that he did not encounter defendant until the summer of 2008, which was two years after defendant's initial petition was summarily dismissed.

¶ 108                                    IV. Order Denying Leave

¶ 109        On May 31, 2012, the trial court entered an order denying defendant leave to file a second petition on the ground that the petition failed to assert "a colorable claim of actual innocence." *People v. Jones*, No. 00 CR 8223(02), slip op. at 4 (Cir. Ct. Cook Co. May 31, 2012).[11] While the court concluded that Telvin Shaw's affidavit was newly discovered evidence, the court rejected defendant's letters and newspaper articles because they "are not admissible" (*id.* at 8), and found that Shaw's affidavit was "not of such a conclusive character that it would likely change the result on retrial." *Jones*, No. 00 CR 8223(02), slip op. at 5.

¶ 110        The court found that the details in Shaw's affidavit comported in almost all respects with "the trial record," including "the color and type of car, where the car was parked, defensive wounds to [the victim's] hands, the type of gun used, the location of the entry wounds, and which door [the victim] exited as he went to the car." *Jones*, No. 00 CR 8223(02), slip op. at 7.

¶ 111        However, the affidavit asserted there was only one shooter, and the trial court concluded this assertion was contradicted by the evidence at trial including defendant's confession, which defendant claims was coerced, and the testimony of Odis Deal that Deal could distinguish firearms by their sound based on his days in the army 30 years ago and that he heard two or three weapons. The trial court also considered that the presence of two different types of cartridge cases established the presence of more than one shooter.

¶ 112                                    V. Motion to Reconsider

¶ 113        On July 11, 2012, defendant moved the court to reconsider its denial of defendant's request to file a second postconviction petition and included a number of supporting exhibits.

¶ 114                                        A. Exhibits

¶ 115        The exhibits[12] attached to defendant's motion to reconsider included pages from the trial testimony of Detective Michael Rose, where Rose testified that at 5 a.m. on March 4, 2000, defendant stated that Melvin Jones had informed him that Jones had shot a young man whom Jones referred to as Old Baby, that Jones hid in a gangway across the street from Lawrence Green's residence, that Jones was by himself, that Jones wanted to catch Lawrence Green entering or exiting the house, that Jones was armed with a .380-caliber semiautomatic handgun, which defendant had observed in Jones's possession on prior occasions, that Jones observed Old Baby exit the rear of Green's residence and walk toward a parked vehicle, that

---

[11]Since the trial court issued two written decisions in this case in 2012, I provide the date in the citation.

[12]The exhibits appear in two different places in the appellate record. In one place, there is a cover sheet from the circuit court, with exhibits after it. The court's cover sheet states that the documents were received on June 29, 2012, and entered into the computer on July 11, 2012.

Jones said words to the effect of "what's up b***" and Old Baby started "flipping off at the mouth," and that Jones shot Old Baby six or seven times with the handgun. Detective Rose testified that he did not videotape the conversation in which defendant stated that he had nothing to do with the offense.

¶ 116 Defendant also included the entire trial testimony of Richard Amberger, a firearms expert employed with the Illinois State Police. Portions of the testimony were underlined, including where Amberger testified that the two .380/9-millimeter bullets received from the morgue were fired from the same firearm as a .380/9-millimeter bullet recovered from the scene and that .380/9-millimeter bullets could be fired out of either a .380-caliber or a 9-millimeter gun. All the .380-caliber cartridge cases recovered at the scene were chambered in the same firearm "at some point," but Amberger could not reach a conclusion about whether they had been fired from the same firearm because the marks left by firing were insufficient to reach that conclusion. The two 9-millimeter cartridge cases were fired from "the same firearm," but he was not asked to clarify what he meant by "the same firearm," and he was not asked whether this was the same firearm that had chambered the .380-caliber cartridge cases.

¶ 117 The attached exhibits included an "Impounding Order," dated May 13, 2003, with a list of items; handwritten statements from Anthony and Darryl Thomas stating that defendant was at a party at the time of the offense; and an "Answer to Discovery" by the State listing witnesses including Anthony and Darryl Thomas and Michelle and Cora Green, whose names were all underlined.

¶ 118                                  VI. Amended Motion to Reconsider

¶ 119 On July 16, 2012, defendant mailed an amended motion to reconsider, which was filed on Monday, July 30, 2012. The amended motion did not attach any additional exhibits, and it argued that the trial court had failed to apply the correct legal standard.

¶ 120 On Thursday, August 2, 2012, the trial court denied defendant's motion for reconsideration on the ground that a motion to reconsider must allege newly discovered evidence, changes in the law, or errors in the court's prior judgment and defendant's motion did not satisfy these grounds.

¶ 121 Defendant filed a *pro se* motion for leave to file a late notice of appeal, which this court granted. This court also appointed the State Appellate Defender, and this appeal followed.

¶ 122                                              ANALYSIS

¶ 123 On this appeal, defendant claims that the trial court erred in denying his *pro se* motion for leave to file a second postconviction petition. For the following reasons, I would reverse and remand for appointment of postconviction counsel and for a second-stage postconviction proceeding.

¶ 124                                  I. Stages of a Postconviction Petition

¶ 125 Although the issue before us is the very preliminary question of whether the petition can even be filed, I provide here a summary of the stages to show how the subsequent process sheds light on this preliminary step. As I explain below, the "probability" needed at this point

to receive leave to file a successive petition is *less than* the "substantial showing" that will be required later at the second stage.[13]

¶ 126    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)) provides for three stages of review by the trial court. *People v. Domagala*, 2013 113688, ¶ 32. At the first stage, the trial court may summarily dismiss a petition that is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2012); *Domagala*, 2013 IL 113688, ¶ 32.

¶ 127    However, for a successive petition to even be filed, the trial court must first determine whether the petition (1) states a colorable claim of actual innocence (*Edwards*, 2012 IL 111711, ¶ 28) or (2) establishes cause and prejudice (*People v. Smith*, 2014 IL 115946, ¶ 34). This standard is higher than the normal first-stage "frivolous or patently without merit" standard applied to initial petitions. *Edwards*, 2012 IL 111711, ¶¶ 25-29; *Smith*, 2014 IL 115946, ¶ 34 ("the cause-and-prejudice test for a successive petition involves a higher standard than the first-stage frivolous or patently without merit standard that is set forth in section 122-2.1(a)(2) of the Act").

¶ 128    Since a filed successive petition has already satisfied a higher standard, the first stage is rendered unnecessary, and the successive petition is docketed directly for second-stage proceedings. See *People v. Sanders*, 2016 IL 118123, ¶¶ 25-28 (with a successive petition, the initial issue before the trial court is whether it "should be docketed for second-stage proceedings"); *People v. Wrice*, 2012 IL 111860, ¶ 90 ("reversing the trial court's order denying leave to file his second successive postconviction petition and remand[ing] to the trial court for *** second-stage postconviction proceedings"); *People v. Jackson*, 2015 IL App (3d) 130575, ¶ 14 ("When a defendant is granted leave to file a successive postconviction petition, the petition is effectively advanced to the second stage of postconviction proceedings."); *People v. Almodovar*, 2013 IL App (1st) 101476, ¶ 1 (reversing the trial court's denial of the defendant's motion for leave to file a successive petition and remanding for second-stage proceedings).

¶ 129    If a trial court permits a successive petition to be filed or does not dismiss an initial petition at the first stage, the petition then advances to the second stage, where counsel is appointed if a defendant is indigent. 725 ILCS 5/122-4 (West 2012); *Domagala*, 2013 IL 113688, ¶ 33; *Wrice*, 2012 IL 111860, ¶ 90 (after reversing the trial court's denial of leave to file a successive petition, the supreme court remanded "for appointment of postconviction counsel and second-stage postconviction proceedings"). After counsel determines whether to amend the petition, the State may file either a motion to dismiss or an answer to the petition. 725 ILCS 5/122-5 (West 2012); *Domagala*, 2013 IL 113688, ¶ 33. At the second stage, the trial court must determine "whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill. 2d 239, 246 (2001).

¶ 130    "The second stage of postconviction review tests the legal sufficiency of the petition. Unless the petitioner's allegations are affirmatively refuted by the record, they are taken as true, and the question is whether those allegations establish or 'show' a constitutional violation. In other words, the 'substantial showing' of a constitutional violation that must be made at the second stage [citation] is a measure of the legal sufficiency of the petition's

---

[13] The majority opinion does not discuss how the "probability" analysis compares to the determinations required at other stages.

- 23 -

well-pled allegations of a constitutional violation, *which if proven* at an evidentiary hearing, would entitle petitioner to relief." (Emphasis in original.) *Domagala*, 2013 IL 113688, ¶ 35.

¶ 131 Both the second stage and a motion for leave to file a successive petition require a review of "the petition and any accompanying documentation." *Edwards*, 197 Ill. 2d at 246 (second stage review); *Edwards*, 2012 IL 111711, ¶ 24 (motion for leave to file a successive petition). For the second stage to not be superfluous for a successive petition, it must be that the "substantial showing" required at the second stage is *greater than* the "probability" required for a successive petition to receive leave for filing. *Smith*, 2014 IL 115946, ¶ 29 (expressing a desire not to "render the entire three-stage postconviction process superfluous").

¶ 132 If the defendant makes a "substantial showing" at the second stage, then the petition advances to a third-stage evidentiary hearing. *Domagala*, 2013 IL 113688, ¶ 34. At a third-stage evidentiary hearing, the trial court acts as fact-finder, determining witness credibility and the weight to be given particular testimony and evidence, and resolving any evidentiary conflicts. *Domagala*, 2013 IL 113688, ¶ 34. This third stage is the same for both initial and successive petitions. *Cf. Smith*, 2014 IL 115946, ¶ 29 ("The legislature clearly intended for further proceedings on successive postconviction petitions."). Thus, for both initial and successive petitions, there is no fact-finding until the third stage.

¶ 133 With all due respect, I believe that the majority is engaging in fact-finding when it concludes that, although Shaw swore that Melvin Jones was " 'alone' " and that defendant " 'did not have any involvement with the murder because "Melvin" was the only person I seen that night,' " it was still *possible* that defendant was there. S*upra* ¶¶ 33, 46. The place to explore possibilities is on cross-examination, at a third-stage evidentiary hearing.[14]

¶ 134 II. Successive Petition

¶ 135 Although our supreme court has made clear that the Act contemplates only one postconviction proceeding, "[n]evertheless, [the supreme] court has, in its case law provided two bases upon which the bar against successive proceedings will be relaxed" (*Edwards*, 2012 IL 111711, ¶ 22), and defendant has alleged both in the instant appeal. Those two bases are (1) cause and prejudice and (2) actual innocence. *Edwards*, 2012 IL 111711, ¶ 22.

¶ 136 Under the cause-and-prejudice test, a defendant must establish both (1) cause for his or her failure to raise the claim earlier and (2) prejudice stemming from his or her failure to do so. *Edwards*, 2012 IL 111711, ¶ 22 (citing *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002)). By contrast, to establish a claim of actual innocence, a defendant must show that the evidence in support of his or her claim is (1) newly discovered, (2) material and not merely cumulative, and (3) of such a conclusive character that it would probably change the result on retrial. *Edwards*, 2012 IL 111711, ¶ 32.

¶ 137 In *Edwards*, the supreme court addressed the standard that a trial court should apply when deciding whether to grant leave to file a successive petition alleging actual innocence. *Edwards*, 2012 IL 111711, ¶ 24. See *People v. Smith*, 2014 IL 115946, ¶ 30 ("*Edwards* involves the standard a petitioner who claims actual innocence must meet in seeking leave to file a successive postconviction petition."). Two years later in *Smith*, the supreme court addressed the same question but with respect to a successive petition alleging cause and

---

[14]When Justice Howse dissented from this court's prior opinion, he was also troubled by "[t]he majority's thinly veiled credibility determination." *Jones*, 399 Ill. App. 3d at 375.

prejudice. *Smith*, 2014 IL 115946, ¶ 32 (observing that, in *Edwards*, "this court did not address the cause-and-prejudice exception *** as it was not at issue in *Edwards*").

¶ 138    With respect to an actual innocence petition, the *Edwards* court held that "leave of court should be denied only where it is clear from a review of the successive petition and the documentation provided by the petitioner that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence." *Edwards*, 2012 IL 111711, ¶ 24. "Stated differently, leave of court should be granted when the petitioner's supporting documentation raises the probability that 'it is more likely than not that no reasonable juror would have convicted him in the light of [this] new evidence' (*Schlup v. Delo*, 513 U.S. 298, 327 (1995) (characterizing the threshold standard as one of probability))." *Edwards*, 2012 IL 111711, ¶ 24. "[M]ore likely than not" means a probability of only "more than 50%." *Perkey v. Portes-Jarol*, 2013 IL App (2d) 120470, ¶ 65.

¶ 139    With all due respect, I believe that the majority is applying a much higher standard. For example, although Shaw swears unequivocally that he witnessed the murder, that Melvin Jones was " 'alone,' " and that defendant "did not have any involvement with the murder," the majority dismisses his affidavit because it did not specifically "state he could see from his vantage point that defendant was not present at the scene." S*upra* ¶ 50. Although Shaw swears that Jones was "alone" and that Jones was "the only person" present, the majority dismisses his affidavit because it did not occur to Shaw to explain that "alone" and "only" mean nobody else—including defendant—was there. S*upra* ¶ 52. To the extent that a specific exclusion of defendant is needed, Shaw's affidavit does specifically exclude him when it states unequivocally that defendant had no "involvement with the murder." However, the majority does not find this specific exclusion to be strong enough. S*upra* ¶ 52 ("[t]he plain language of Shaw's affidavit does not exonerate defendant"). As Justice Howse already observed when dissenting from a prior opinion in this case, it is "important to note that if defendant's *pro se* petition advanced *** a lawyer would be appointed and an opportunity presented *** to possibly cure the defect identified by the majority." *Jones*, 399 Ill. App. 3d at 378 (Howse, J., dissenting).

¶ 140    With respect to the cause-and-prejudice test, the *Smith* court held that "a defendant's *pro se* motion for leave to file a successive postconviction petition will meet the section 122-1(f) cause and prejudice requirement if the motion adequately alleges facts demonstrating cause and prejudice." *Smith*, 2014 IL 115946, ¶ 34. "[L]eave of court to file a successive postconviction petition should be denied when it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *Smith*, 2014 IL 115946, ¶ 35. Thus, the *Smith* test for cause and prejudice is different from the *Edwards* test, which applies to successive petitions alleging actual innocence.

¶ 141                                    III. Standard of Review

¶ 142    As noted, defendant raises two claims. He claims that the trial court erred in denying him leave (1) where he presented a colorable claim of actual innocence and (2) where he established cause and prejudice to allow the filing of a subsequent petition. The majority declines to decide the appropriate standard of review for the first claim and does not discuss the

- 25 -

standard of review for the second claim. S*upra* ¶¶ 45, 59. For the reasons discussed below, I believe that the appropriate standard of review for both claims is *de novo*.

¶ 143    "Having established what a petitioner must set forth when seeking leave of court to file a successive petition on the basis of actual innocence, [the *Edwards* court] turn[ed] to the standard of review ***." *Edwards*, 2012 IL 111711, ¶ 30.

¶ 144    First, the *Edwards* court observed that "[g]enerally, decisions granting or denying 'leave of court' are reviewed for an abuse of discretion." *Edwards*, 2012 IL 111711, ¶ 30. But next, the *Edwards* court stated: "However, as we have just noted, a trial court should deny leave only in cases where, as a matter of law, no colorable claim of actual innocence has been asserted. This suggests a *de novo* review." *Edwards*, 2012 IL 111711, ¶ 30. The court then found that it "need not decide this question in this case," and so it left this question "for another day and a more appropriate case." *Edwards*, 2012 IL 111711, ¶ 30.

¶ 145    Following the suggestion of our supreme court in *Edwards*, I will apply a *de novo* standard of review to the actual innocence claim. As the *Edwards* court itself observed, we are faced with a purely legal question, and legal questions are generally reviewed under a *de novo* standard. *Edwards*, 2012 IL 111711, ¶ 30. In addition, *de novo* review furthers the original goal of the actual-innocence exception, which is to prevent a fundamental miscarriage of justice. *Edwards*, 2012 IL 111711, ¶ 23.

¶ 146    Next I discuss the appropriate standard of review for defendant's second claim of cause and prejudice.

¶ 147    In *Smith*, the issue was whether the Act prohibited the denial of leave when the pleadings of the petition made an " 'arguable' " showing of cause and prejudice. *Smith*, 2014 IL 115946, ¶ 25 (quoting the defendant's petition). The *Smith* court observed that the standard of review for "this issue of statutory construction" was *de novo*. *Smith*, 2014 IL 115946, ¶ 21. However, the *Smith* court did not explicitly state, after resolving this issue of statutory construction, whether the standard of review for a trial court's grant or denial of leave to file a successive petition was then also *de novo*.

¶ 148    Since cause-and-prejudice claims may fail either as a matter of law or due to an insufficiency of the petition and supporting documents, I conclude, as have other appellate courts, that a *de novo* standard of review also applies. *People v. Diggins*, 2015 IL App (3d) 130315, ¶ 7 (applying a *de novo* standard of review to the trial court's denial of the defendant's motion to file a successive petition alleging cause and prejudice, because this issue is "resolved on the pleadings" alone); *People v. Crenshaw*, 2015 IL App (4th) 131035, ¶ 38 (applying a *de novo* standard of review to the trial court's denial of the defendant's motion to file a successive petition alleging cause and prejudice); see also *People v. Wrice*, 2012 IL 111860, ¶ 50 (applying a *de novo* standard of review to the State's arguments concerning lack of prejudice to the defendant, since these "arguments raise purely legal issues").

¶ 149    When our review is limited to documentary materials, as it is here, then our review is generally *de novo*. *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 154 (2007) ("Where the circuit court does not hear testimony and bases its decision on documentary evidence, the rationale underlying a deferential standard of review is inapplicable and review is *de novo*."); *Dowling v. Chicago Options Associates, Inc.*, 226 Ill. 2d 277, 285 (2007) (where the trial court "did not conduct an evidentiary hearing" or "make any findings of fact" and "relied on the parties' oral argument and the record," "we review the court's ruling on this issue *de novo*").

¶ 150    Thus, I will apply a *de novo* review to both of defendant's claims. *De novo* consideration means that we perform the same analysis that a trial judge would perform. *In re N.H.*, 2016 IL App (1st) 152504, ¶ 50 (citing *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011)).

¶ 151                                        IV. The Record

¶ 152    The next question is what we are permitted to review. This is a question that this court has already thoroughly analyzed in *People v. Jackson*, 2014 IL App (1st) 143025, ¶¶ 36-45. Thus, I will repeat here simply the conclusion that we reached in *Jackson*, which is that we should "review defendant's two claims primarily in light of the documentation he submitted, as well as our prior opinions and orders." *Jackson*, 2014 IL App (1st) 143025, ¶¶ 36-45.

¶ 153                                      V. Actual Innocence

¶ 154    Defendant's first claim is actual innocence. As stated, to establish a claim of actual innocence, a defendant must establish that the evidence in support of his or her claim is (1) newly discovered, (2) material and not merely cumulative, and (3) of such a conclusive character that it would probably change the result on retrial. *Edwards*, 2012 IL 111711, ¶ 32.

¶ 155                                    A. Newly Discovered

¶ 156    First, I agree with the trial court that Shaw's affidavit is newly discovered. If we accept, as we must at this preliminary stage, defendant's assertion that he is innocent and was not present at the shooting, then he would have no way of knowing who *was* present and who could exonerate him. *People v. Williams*, 392 Ill. App. 3d 359, 367 (2009) (in reviewing a trial court's denial of leave to file a "successive postconviction petition, all well-pleaded facts in the petition and supporting affidavits are taken as true"); see also *People v. Brown*, 236 Ill. 2d 175, 193 (2010) (at the first stage, we must "accept as true *** the allegations of the *pro se* petition"). In addition, Shaw averred that he fled to California shortly after the January 8, 2000, shooting because attempts were made on his life, thereby making himself unavailable. *People v. Ortiz*, 235 Ill. 2d 319, 334 (2009) (an eyewitness was newly discovered when he "essentially made himself unavailable as a witness when he moved to Wisconsin shortly after the murder").[15] Thus, I agree with the trial court's finding that Shaw's affidavit is newly discovered.

¶ 157    The trial court rejected defendant's letter and newspaper article[16] on the ground that they were "inadmissible." *Jones*, No. 00 CR 8223(02), slip op. at 8. However, admissibility is not the standard in postconviction proceedings. Our supreme court specifically amended the Illinois Rules of Evidence so that admissibility is not even the standard at the later third-stage postconviction hearings. Ill. R. Evid. 1101(b)(3) (eff. Jan. 6, 2015) (the Illinois Rules of

---

[15]While the majority opinion does not discuss whether the evidence is newly discovered, it does observe that Shaw returned to Chicago in February 2001. *Supra* ¶ 52. However, his return does not lessen the fact that defendant would have no way of knowing that Shaw was a witness to the murder if defendant was not there.

[16]The trial court considered the letter and newspaper article as part of defendant's actual innocence claim, which is what defendant argued in his petition. *Jones*, No. 00 CR 8223(02), slip op. at 3. Defendant's appellate brief discusses it as part of his second claim, concerning cause and prejudice. We consider it under both.

Evidence "do not apply" to "postconviction hearings").[17] This is even more true at this early stage, where the imprisoned defendant has no access to counsel.[18] The question is whether the documentation that the defendant does present could lead, after counsel is appointed, to admissible evidence at a future retrial. See *Edwards*, 197 Ill. 2d at 246 ("a substantial showing" is not required until the second stage).

¶ 158    There is nothing before us to suggest that evidence about possible misconduct by Officer Bartik and Detectives Lenihan and Farley was available to defendant earlier. The article submitted by defendant concerns defendant Donny McGee, and the State argues that, since McGee was acquitted in 2004, McGee's "claims of fabricating his confession" must have been "available" in 2004, which was before defendant filed his first postconviction petition in 2005. However, the State cites no source to support its claim that McGee's claims must have been available in 2004. News of McGee's claims was not widely reported until June 2010,[19] when a jury awarded McGee over a million dollars in damages.[20] This verdict was issued months after this court had already dismissed defendant's initial postconviction petition. *Jones*, 399 Ill. App. 3d 341 (decided March 5, 2010). In 2005, when defendant filed his first petition, the McGee parties were still in the midst of an unpublished discovery dispute, with the city seeking a protective order in order to keep " 'polygraph related files' " and other documents "from public view." *McGee v. City of Chicago*, No. 04 C 6352, 2005 WL 3215558, at *4 (N.D. Ill. June 23, 2005).[21] Thus, I do not find this argument persuasive.

----

[17] Rule 1101 of the Illinois Rules of Evidence was amended on April 8, 2013, to include "postconviction hearings" on the list of proceedings to which the rules of evidence do not apply. Ill. R. Evid. 1101(b)(3) (eff. Apr. 8, 2013). Thus, case law issued prior to this date, which does not take this change into account, may not be applicable. Although the trial court's decision was issued before the amendment, our review is *de novo*, and thus, this amendment governs our consideration.

[18] The State cited *McCall v. Devine*, 334 Ill. App. 3d 192 (2002), for the proposition that defendant's newspaper articles are inadmissible hearsay. However, in *McCall*, 334 Ill. App. 3d at 203, we held that newspaper articles were inadmissible in a civil suit by a mother seeking appointment of a special prosecutor to investigate the death of her son. In contrast to civil suits, our supreme court has specifically provided that the rules of evidence, including the rules of hearsay, do not apply in postconviction proceedings. Ill. R. Evid. 1101(b)(3) (eff. Apr. 8, 2013).

[19] There were a number of articles about the McGee case in June 2010. We cite here only one as an example. *Donny McGee Awarded $1.3M After Police MADE UP His Confession*, Huffington Post (June 10, 2010), http://www.huffingtonpost.com/2010/06/10/donny-mcgee-awarded-13m-a_n_607393.html.

[20] On June 8, 2010, a civil jury awarded $1.3 million to McGee, but the case was appealed and remanded for a new trial because one juror did outside research. *McGee*, 2012 IL App (1st) 111084, ¶¶ 5-6. In 2014, the city settled the case for $870,000, thereby avoiding a new trial and any admission of wrongdoing by the city. Hal Dardick & Duaa Eldeib, *Chicago Aldermen OK $6.6 Million to Settle Lawsuits*, Chi. Trib. (Mar. 31, 2014), *available at* http://articles.chicagotribune.com/2014-03-31/news/chi-chicago-aldermen-ok-66-million-to-settle-lawsuits-20140331_1_leslie-darling-new-trial-city-attorney.

[21] Although the McGee case was unpublished, I cite it for the fact that it was unpublished and not for any precedential value.

## B. Material and Not Cumulative

¶ 159

¶ 160    Second, the trial court did not reject defendant's evidence on the basis that it lacked materiality or was merely cumulative, and I agree.

¶ 161    Shaw's affidavit was material and not cumulative. His affidavit, if true, may likely exonerate defendant. Other than the shooter, Shaw is the only known eyewitness to the murder. The trial court found that the details in Shaw's affidavit comported in almost all respects with "the trial record," including "the color and type of car, where the car was parked, defensive wounds to [the victim's] hands, the type of gun used, the location of the entry wounds, and which door [the victim] exited as he went to the car." *Jones*, No. 00 CR 8223(02), slip op. at 7. Thus, Shaw's affidavit is material and not merely cumulative. *Ortiz*, 235 Ill. 2d at 335-36 (the testimony of a newly discovered eyewitness was material where it "supplied a first-person account of the incident that directly contradicted the prior statements" of the State's two eyewitnesses); see also *People v. Coleman*, 2013 IL 113307, ¶ 103 (testimony of codefendants, stating that the defendant was not even present, was material).

¶ 162    Similarly, the information in the letter and newspaper article is not cumulative of any information previously presented. Defendant moved to suppress his confession before trial on the grounds that Officer Bartik, who is the polygraph examiner, shoved and punched defendant while Detectives Lenihan and Farley watched. The trial court denied the motion, expressing incredulity that a polygraph examiner would act this way.[22] Evidence of prior, similar misconduct by these same officers may have corroborated defendant's claim of physical and psychological coercion. Where the only evidence connecting defendant to this murder is his own confession, information corroborating his claim of physical coercion is material.

¶ 163    This is particularly true where certain details regarding the confession did not match the other evidence. If defendant's videotaped confession was accurate and defendant fired a .357-caliber handgun toward the victim, after the victim had been the target of numerous other gunshots and as the victim was falling to the ground, then defendant was firing toward an almost stationary target and one would expect to find .357-caliber bullets in or near the victim. However, no .357-caliber bullets were discovered or recovered from the body or the crime scene. This is an important piece of evidence that supports a grant of defendant's request to file a second postconviction petition.

## C. Probability of a Different Result

¶ 164

¶ 165    Lastly, to establish a claim of actual innocence, a defendant must demonstrate that the evidence in support of his or her claim is of such a conclusive character that it would probably change the result on retrial. *Edwards*, 2012 IL 111711, ¶ 32.

¶ 166    The *Edwards* court stated the question as follows: "the question is whether petitioner set forth a colorable claim of actual innocence. In other words, did petitioner's request for leave of court and his supporting documentation raise the probability that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence?" *Edwards*, 2012 IL 111711, ¶ 31. However, this "probability" is less than the "substantial showing" required at the second stage. *Supra* ¶ 131.

---

[22]In denying defendant's motion to suppress, the trial court stated: "But of all the people that he comes in contact with, it's the polygraph examiner who pushes and shoves him? It doesn't make sense at all."

¶ 167    The cumulative effect of the documentation in support of defendant's innocence, which was not available at his prior trial, raises the probability that it is more likely than not that he would not be convicted. *People v. Ortiz*, 385 Ill. App. 3d 1, 12-13 (2008) (discussing the cumulative evidence now available to the defendant, in order to determine whether the result would probably change at retrial), *aff'd*, 235 Ill. 2d 319, 336-37 (2009). It includes (1) the affidavit of a newly discovered eyewitness who states that defendant was not even present at the crime scene; (2) the affidavit of the actual shooter who avers that defendant was not involved;[23] (3) the statements of two alibi witnesses, discovered posttrial by the prosecutor, that defendant was with them, and included in defendant's motion to reconsider; and (4) information concerning similar misconduct by the same officers who obtained defendant's confession. *Tyler*, 2015 IL App (1st) 123470, ¶¶ 4, 21 (reversing the dismissal of the defendant's postconviction petition and remanding for a hearing on the defendant's coerced confession claim where the initial confession was obtained during a 45-minute interview with Detective Lenihan); *McGee*, 2012 IL App (1st) 111084, ¶¶ 1-4.

¶ 168    In contrast, at trial, there were no eyewitnesses at trial, no physical evidence linking defendant to the murder, and no evidence of an arrest of defendant at the crime scene. *Almodovar*, 2013 IL App (1st) 101476, ¶ 79 (granting the defendant leave to file a successive petition and finding that the new evidence would probably change the result on retrial, where "[n]o physical evidence link[ed] the defendant to the shooting," where the two eyewitnesses had "only a brief opportunity to see the perpetrators," and where the defendant attached a newspaper article concerning past misconduct by the same detective).

¶ 169    The only evidence at trial linking defendant to the offense was his own videotaped confession, which defendant has consistently claimed was coerced. *People v. Patterson*, 192 Ill. 2d 93, 145 (2000) (reversing for a third-stage evidentiary hearing, the court stressed that "defendant has consistently claimed" his confession was coerced). Also, some of the details of his confession do not comport with the physical evidence. In the confession, defendant stated, in essence, that he fired a .357-caliber handgun toward an already incapacitated victim, but no .357-caliber bullets were recovered from the body or at the scene.

¶ 170    In addition, this court does not have to turn a blind eye to the fact that it is odd that a defendant would volunteer for a polygraph examination and then confess to the examiner before ever receiving one.[24] This odd series of events was testified to, not by defendant, but by Detective Lenihan. Not only is it odd, but using a pretest interview to elicit a confession is also prohibited. 68 Ill. Adm. Code 1230.90(c) (2015)[25] ("The examiner shall not initiate an accusatory interrogation prior to the test for the purpose of eliciting a confession or admission

---

[23]In discussing the affidavit of the lone shooter, Melvin Jones, Justice Howse stated: "Simply put, nothing in the record before us concretely disproves or rebuts the allegations found in Melvin's affidavit." *Jones*, 399 Ill. App. 3d at 375 (Howse, J., dissenting).

[24]"Bartik stated in court testimony that he got more than 100 confessions in a five-year period in pretest interviews—a number that strikes some experts as extraordinary. They said the pretest is not a time to try to get confessions; it's when the examiner explains how the polygraph works, gets consent and reviews the questions." Duaa Eldeib, *Polygraphs and False Confessions in Chicago*, Chi. Trib. (Mar. 10, 2013), *available at* http://www.chicagotribune.com/ct-met-polygraph-confessions-20130310,0,57552.story.

[25]This prohibition has been in effect since at least 1998. 68 Ill. Adm. Code 1230.90(c), amended at 22 Ill. Reg. 10567 (eff. June 1, 1998).

against interest for the prospective subject."); *cf. People v. Hattery*, 183 Ill. App. 3d 785, 822 (1989) ("In a number of cases, Illinois courts have held that confessions following polygraph examinations were properly suppressed."); see also *People v. Taylor*, 101 Ill. 2d 377, 391-92 (1984) (polygraph examinations have no place in Illinois courts to prove either guilt or innocence).

¶ 171      Although odd, this has happened in a number of other appellate court cases involving Officer Bartik. *E.g., People v. Cook*, 352 Ill. App. 3d 108, 112 (2004) (Officer Bartik testified that the defendant confessed before he even began the actual polygraph examination); *People v. Daniels*, 2014 IL App (1st) 130063-U, ¶ 65 (Officer Bartik testified that the defendant confessed during the pretest interview);[26] see also *Murphy v. Atchison*, No. 12 C 1206, 2013 WL 4495652, at *1, *5 (N.D. Ill. Aug. 9, 2013) (Officer Bartik testified that the defendant confessed prior to taking the test); *Murphy*, 2013 WL 4495652, at *1 (in the case involving defendant Donny McGee, Officer Bartik testified that, while he was preparing to administer a polygraph test, McGee confessed to the murder; McGee was subsequently acquitted);[27] *Lanza v. City of Chicago*, No. 08 C 5103, 2009 WL 3229407, at *1-2 (N.D. Ill. Oct. 1, 2009) (a criminal defendant alleged that "Bartik and two detectives claimed that [he] confessed to the [offense] before they had the opportunity to give him a lie detector test" and that the charges against him were eventually dropped).

¶ 172      In *People v. Harris*, 389 Ill. App. 3d 107, 116 (2009), the defendant testified that Officer Bartik repeatedly accused her of lying, stating: " 'You know what, Nicole, you are p*** me off. I've been patient with you and you are still sitting up here, you are lying to us, you know what, you're acting like a monster.' " Bartik stated that she would "spend the rest of your life behind bars because you won't cooperate." Ultimately, the Seventh Circuit Court of Appeals granted the defendant a writ of *habeas corpus* and granted the State 120 days within which to decide whether to retry her. *Harris v. Thompson*, 698 F.3d 609, 650 (7th Cir. 2012).[28]

¶ 173      I do not find dispositive the fact that defendant did not mention in the letters to his parents that the polygraph examiner pushed and shoved him. In his pretrial suppression motion, defendant claimed that the polygraph examiner punched and shoved him and that defendant was also subjected to psychological and mental coercion. In the letter to his parents, dated March 25, 2000, which was attached to his first petition, defendant stated that the examiner threatened him with "the death penalty" because the examiner knew "for a fact" that defendant would fail the test, as "it was set up for [him] to fail." I do not find dispositive the omission of punching in the letter because, in both the motion and the letter, defendant made a statement

---

[26]Although *Daniels*, *Murphy*, and *Lanza* are unpublished cases, we are not citing them for their precedential value but solely for their facts. Ill. S. Ct. R. 23(e)(1) (eff. July 1, 2011) (an unpublished order may not be cited as "precedential").

[27]"At the heart of McGee's case and others is whether Chicago police used their polygraph unit as a tool to obtain false confessions. At least five defendants—four of whom were charged with murder—have been cleared since 2002. In a sixth case, a federal appeals court threw out a murder conviction ***. In five of the six cases, suspects were taken to Bartik." Duaa Eldeib, *Polygraphs and False Confessions*, Chi. Trib. (Mar. 10, 2013), *available at* http://www.chicagotribune.com/ct-met-polygraph-confessions-20130310,0,57552.story.

[28]The State elected not to retry Harris. Duaa Eldeib & Lisa Black, *Mother Finally Feels Free*, Chi. Trib. (June 18, 2013), *available at* http://articles.chicagotribune.com/2013-06-18/news/ct-met-nicole-harris-retrial-20130618_1_jaquari-dancy-nicole-harris-alleged-confession.

concerning coercive behavior by the polygraph examiner. The reason for a difference in details is a credibility issue, which is best explored in the trial court at an evidentiary hearing, rather than from the paper record of an appellate court.

¶ 174 The trial court concluded that the assertion in Shaw's affidavit of only one shooter was contradicted by the evidence at trial. We review this conclusion *de novo*. The trial court's conclusion was based primarily on (1) defendant's confession, which defendant claims was coerced, (2) the testimony of Odis Deal, who testified that he could distinguish between guns based on his days in the army 30 years ago, and (3) the presence of two different types of cartridge cases. The trial court considered that two different cartridge cases meant that there *had to be* two different shooters. However, the firearms expert testified that .380/9-millimeter bullets can be fired from either a .380-caliber or 9-millimeter gun. Thus, the physical evidence at trial does not comport with this conclusion. In addition, Deal's testimony was not strong evidence of two shooters, and defendant has consistently claimed that his confession was coerced, before trial, during trial, and in posttrial motions. Curtis Moore testified that some gunshots sounded louder than others, and also officers testified that cartridges were found on either side of the vehicle. However, this is consistent with the victim trying to move away from his attacker, rather than remaining stationary upon observing a gunman.

¶ 175 In sum, I find a probability that the evidence uncovered since defendant's trial may produce a new result at a retrial, where (1) the only evidence linking the 19-year-old defendant to the crime was his own confession; (2) the circumstances of the initial confession were odd; (3) some details in the confession did not match the physical evidence recovered at the crime scene; (4) the one and only known eyewitness to the crime, other than the shooter, exonerates defendant; (5) the confessed shooter exonerates defendant; (6) alibi witnesses, produced not by defendant but by the prosecutor, exonerate defendant; and (7) recent information supports defendant's claim that his confession was physically coerced.

¶ 176 Thus, I would reverse and remand for appointment of counsel and for second-stage proceedings.

¶ 177 VI. Cause-and-Prejudice Test

¶ 178 Defendant also claims that the trial court erred in denying him leave to file his second postconviction petition because he satisfied the cause-and-prejudice test. This exception was articulated first by our supreme court in *Pitsonbarger*, 205 Ill. 2d at 459, and later codified by our state legislature in section 122-1(f) of the Act (725 ILCS 5/122-1(f) (West 2012)). See also *Edwards*, 2012 IL 111711, ¶ 22 ("The General Assembly codified the cause-and-prejudice exception in section 122-1(f) of the Act, several years after our decision in *Pitsonbarger*.").

¶ 179 Section 122-1(f) of the Act provides that "(1) a prisoner shows cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings; and (2) a prisoner shows prejudice by demonstrating that the claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." 725 ILCS 5/122-1(f) (West 2012).

¶ 180 Our supreme court observed: "Section 122-1(f) does not provide for an evidentiary hearing on the cause-and-prejudice issues and, therefore, it is clear that the legislature intended that the cause-and-prejudice determination be made on the pleadings prior to the first stage of postconviction proceedings." *Smith*, 2014 IL 115946, ¶ 33.

¶ 181 Defendant argues that the APD's letter and the attached newspaper article satisfy the cause-and-prejudice test. This court's decision in *People v. Almodovar*, 2013 IL App (1st) 101476, is instructive. In *Almodovar*, a defendant moved for leave to file a successive postconviction petition and attached a Chicago Tribune article, which disclosed a prior incident of suggestive identification by the same detective whom defendant had accused of suggestive identification in his initial postconviction petition. *Almodovar*, 2013 IL App (1st) 101476, ¶¶ 38, 52, 55. This court found that the defendant had satisfied the cause requirement, since "he was impeded from fully raising that claim in the prior proceeding because he was not able to properly challenge the credibility of [the detective's] testimony without evidence of his pattern of misconduct in other cases." *Almodovar*, 2013 IL App (1st) 101476, ¶¶ 63-64. A defendant's lack of evidence that an officer has committed misconduct in circumstances similar to those of the defendant can serve as cause for failing to fully raise that claim in prior proceedings. *Almodovar*, 2013 IL App (1st) 101476, ¶¶ 64-68; see also *People v. Reyes*, 369 Ill. App. 3d 1, 21 (2006) ("any allegation that [the detective] coerced a person to provide evidence is relevant to whether defendants in the case at bar were similarly coerced," and thus summary dismissal was inappropriate, even though the issue of coerced confession had been raised on direct appeal). Thus, defendant has satisfied the cause requirement. As for prejudice, I discussed the prejudice to defendant in the above section. *People v. Mitchell*, 2012 IL App (1st) 100907, ¶ 62 (reports of a detective's "perjury in similar cases involving alleged confessions" satisfied the prejudice requirement for the filing of a successive petition, where, "[w]ithout testimony from prosecution witnesses who said that [defendant] confessed to the crimes, the State had no case against [defendant] at all"); *Almodovar*, 2013 IL App (1st) 101476, ¶ 62 (the prejudice requirement was satisfied for the filing of a successive petition where, if the detective "actually did use suggestive identification procedures as alleged by defendant, it would constitute prejudice").

¶ 182                                        CONCLUSION

¶ 183 For the foregoing reasons, I would reverse and remand for appointment of postconviction counsel and advance the case to a second-stage postconviction proceeding. This is the second time that a postconviction petition from this defendant has been appealed and resulted in a split panel of the appellate court. *Jones*, 399 Ill. App. 3d at 373 (Howse, J., dissenting.) The repeated splits among different panels of justices demonstrate that this is a case upon which reasonable minds can and do differ. The fact that reasonable jurists can and do repeatedly differ supports the conclusion that this case merits further consideration at a further stage.

¶ 184 In addition to reversing, I would direct the trial court to hold second-stage proceedings promptly, in light of the fact that 14 years have elapsed since defendant's conviction and the formerly 19-year-old defendant is now in his thirties.

¶ 185 Lastly, I feel forced to respond to Justice Lampkin's personal attack that my statement concerning *Tyler* was "absolutely false." *Supra* ¶ 64. That type of conduct lacks civility and has no place in an appellate opinion. Justice Lampkin rewrites, in effect, my parenthetical about *Tyler* and then argues against her own creation. What I actually wrote in the parenthetical is correct. I know what *Tyler* stands for. I authored *Tyler*. My parenthetical states: "this court reversed the dismissal of the defendant's postconviction petition and remanded for a hearing on defendant's coerced confession claim where the initial confession was obtained during a 45-minute interview with Detective Lenihan." *Supra* ¶ 86. Every word of that

parenthetical is absolutely true. My citation was to *Tyler*, 2015 IL App (1st) 123470, ¶¶ 4, 21, which substantiates every word of that parenthetical. Paragraph 4 of *Tyler* states "we reverse and remand for the limited purpose of requiring the trial court to conduct a third-stage evidentiary hearing on defendant's coerced confession claim." Similarly, the parenthetical stated "this court reversed the dismissal of the defendant's postconviction petition and remanded for a hearing on defendant's coerced confession claim." Paragraph 21 of *Tyler* states that it was "[d]uring his 45-minute conversation with Detective Lenihan" that "defendant confessed." *Tyler*, 2015 IL App (1st) 123470, ¶ 21. Similarly, the parenthetical stated that "the initial confession was obtained during a 45-minute interview with Detective Lenihan." Supra ¶ 86.

¶ 186    In the end, however, it is important to keep in mind what is at stake here. This appeal is not about the jurists but about a defendant that may be innocent. The name-calling between us is nonproductive and creates a sideshow that distracts from the real issue at hand, which is whether a possibly innocent man will spend almost his entire life behind bars. In addition, an accusation like "absolutely false" undermines the reputation and authority of this court and every justice that sits on it.

¶ 187    What is at stake here is the possible wrongful incarceration of a man who is asking only for the opportunity to file his claims so that they can be heard by the trial court. I would give him that opportunity to be heard, and thus, I must respectfully dissent.