2019 IL App (2d) 18-357-U
No. 2-18-0357
Order filed November 21, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 2009-CF-0508 |
| FRANCISCO SALAZAR, | ) ) ) | Honorable Timothy J. McCann, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING BIRKETT delivered the judgment of the court.
Justices Schostok and Bridges concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We applied a manifest weight of the evidence standard on appeal since the trial court reviewed additional evidence at the third-stage evidentiary hearing in the form of the shooter's affidavit and his testimony. In doing so, we held that the trial court properly denied defendant's third-stage post-conviction petition alleging actual innocence because the shooter's testimony at the hearing was not credible. Also, the evidence offered at the hearing was not new, material or noncumulative. Therefore, we did not need to address whether that evidence was of such conclusive character that it would probably change the result on retrial. Accordingly, we affirmed the judgment of the trial court.

¶ 2     After a third-stage evidentiary hearing, the trial court denied defendant Francisco Salazar's post-conviction petition that alleged actual innocence.  (735 ILCS 5/122-6 (West 2016)).  Defendant appeals from the denial of his petition.  For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

Defendant was convicted of one count of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2008)) and two counts of attempted first-degree murder (720 ILCS 5/8-4(a), 9-1 (West 2008)).  All three convictions were based upon a theory of accountability.  Defendant was subsequently sentenced to 30 years' imprisonment on the first-degree murder conviction and 15- and 10-years' imprisonment on the attempted murder convictions.  All sentences were ordered to be served consecutively.  On direct appeal this court affirmed defendant's convictions for first degree murder and two counts of attempted murder under a theory of accountability when the evidence at trial demonstrated that defendant shared a common design to aid another in the commission of the offenses. *People v. Salazar*, 2014 IL App (2d) 130047.    (*Salazar I*).

¶ 4     Since defendant's claim of actual innocence is directly related to the underlying facts introduced at his trial, we will reiterate those facts set out in defendant's direct appeal.

¶ 5     At trial, defendant testified that around 10:00 p.m. on December 19, 2009, he received a telephone call from George Aguilar.  Aguilar asked defendant to come over to his house.  Defendant texted his girlfriend to see if he could meet with her later that evening, and he then drove to Aguilar's house near Montgomery, Illinois.  When defendant got to the house, he saw Zachary Reyes, Eloy Sandoval and Cesar Corral standing outside with Aguilar.  Defendant knew Aguilar well and "hung out" with Sandoval frequently, although he did not have Sandoval's telephone number.  He did not know Corral very well.  Defendant said that he was not in a gang, but he knew Aguilar and Sandoval were both Latin King gang members.  He did not know if Reyes

or Corral were members of a gang. Defendant said he had never met Reyes before that night.

¶ 6    Defendant and the four other men got into defendant's Chevy Tahoe. Reyes was the front passenger, Corral sat behind Reyes, Sandoval sat in the middle of the back seat, and Aguilar sat behind defendant. They decided to go to a party in Oswego, but stopped at a 7-Eleven store on the way. Corral went into the store and bought alcohol and cigars. Corral, Aguilar and Sandoval made the cigars into marijuana filled "blunts." The three people in the back seat smoked the blunts and Corral and Sandoval also drank alcohol while defendant drove.

¶ 7    Defendant testified that he was not familiar with the area and did not know where to go. Sandoval directed defendant to the party, and when they arrived, Sandoval told Reyes and Corral to go in and see whether the party was worth the cover charge. When Reyes and Corral came back to the vehicle they said the party may not be worth their time. Defendant began to drive away and Corral told him to wait. Defendant said he looked over at Corral and saw him "doing some hand gestures and flicking somebody off." Defendant then drove off.

¶ 8    Sandoval told defendant that he had missed the turn and that he needed to turn around, so defendant did so. Defendant said that he was trying to get out of the area, but Sandoval suggested going back to the party. Defendant also said that Aguilar stated he just wanted to go home.[1] Defendant told them to make up their minds, and did another U-turn. Defendant pulled up to the intersection at Douglas and Long Beach and stopped at the stoplight. Defendant testified that he was planning to turn left, and noticed the taillights of a vehicle turning off to the right. He reached for his cell phone to text his girlfriend that he was on his way home and all of a sudden he heard big bangs and he started to duck because he thought he was getting shot at.

---

[1] Aguilar was deceased at the time of trial, and the details surrounding his death were not disclosed.

¶ 9    The evidence at trial established that Reyes had fired eleven .45 caliber rounds in the direction of a vehicle driven by Jason Ventura. In Ventura's vehicle were Eduardo Gaytan and Jorge Ruiz. After Ventura was shot in the head he slumped over the steering wheel. The car continued to drive, and was headed toward a house. Ruiz, who was in the back seat of Ventura's vehicle, grabbed the steering wheel and turned it to the right as much as possible. The vehicle eventually hit a tree and stopped. Ruiz jumped out of the vehicle and began motioning to Deputy Bryan Harl of the Kendall County Sheriff's office, who was driving in the area and witnessed the vehicle hit the tree. Harl called for an ambulance and told dispatch that the offending vehicle was a dark colored Tahoe. Ventura died as a result of multiple gunshot wounds, including one to his forehead. Gaytan was shot in both his arm and hip area. Ruiz was unharmed, although the back window of the Impala was shattered.

¶ 10    Defendant testified that immediately after the shooting Sandoval said, "go, go, go, what the fuck are you still doing here?" Defendant drove away. He asked Sandoval where to go, and Sandoval directed him to a parking spot in an apartment complex. The subdivision where defendant was driving was known as the "spaghetti bowl" because it is a tangle of streets with very few entrance and exit points. Defendant began to argue with Sandoval because he thought Sandoval knew that Reyes was going to shoot at the other car. Defendant asked Sandoval why he did not warn him. Defendant testified that he said, "why the hell [sic] you doing this, this is stupid shit out of the truck that I am driving?" Defendant said that Sandoval replied, "calm the fuck down" and that defendant was no one to him. Sandoval told Reyes to get out of the vehicle and get rid of the gun, and Reyes did so. Sandoval then directed defendant to another set of apartments and told defendant to stop. Sandoval told Reyes to get rid of the hoody-type sweatshirt he was wearing. Again, Reyes did so. Sandoval took one of his shirts off and gave it to Reyes to wear.

¶ 11    Defendant drove out of the apartment complex and passed a squad car. The squad car followed defendant's vehicle to Aurora, and at some point, Reyes threw a small bag of marijuana out of the window. Defendant said that he was frightened. Sandoval told him to try to evade the police through one of the side streets. Defendant said that he refused to do so. Officer Shane Burgwald of the Oswego police department pulled defendant's vehicle over and, with weapons drawn, ordered each passenger out of the vehicle individually.

¶ 12    Defendant testified that he never spoke with Reyes, Sandoval or Corral before meeting at Aguilar's home that evening. When he arrived at Aguilar's house there was no discussion about committing any violence and there was no "gang talk" whatsoever on the way to the party. Defendant never saw a gun prior to the shooting and did not hear anyone talking about a gun or any weapon. In rebuttal, the State introduced a certified copy of defendant's burglary conviction.

¶ 13    Sandoval and Corral were not charged with any crimes and both testified for the State. The men, who were best friends, both testified that there was no sight of a gun or talk about guns prior to the shooting. Sandoval disagreed, however, with defendant's account of Sandoval's actions during the incident.

¶ 14    Sandoval testified and admitted that in 2009 he had been a member of the Latin King street gang for four or five years. Corral was a long time friend of his and Aguilar was also a fellow gang member. Sandoval said that defendant was both a friend and a fellow Latin King gang member. Reyes was considered a "gang contact" of Sandoval's.

¶ 15    Sandoval said that on December 19, 2009, he was with Corral at Aguilar's home when he saw defendant and Reyes arrive together in a vehicle. Sandoval admitted that he and Corral drank alcohol and smoked blunts with Aguilar. Defendant did not know how to get to the party, so Sandoval directed him. When they arrived at the party Reyes and Corral went inside the house.

They returned about five minutes later and the five men discussed whether they should go inside. At that point they saw two men come out of the party. Sandoval said that Aguilar and Reyes recognized them as belonging to the Ambrose street gang, a rival gang of the Latin Kings. The two men got into a Chevy Impala. Defendant pulled his vehicle up alongside the Impala and Reyes made gang signs that were disrespectful to the Ambrose gang. Sandoval did not see any response from the people in the Impala. He did not want anything to happen that night because the party was thrown by his sister's friends.

¶ 16 According to Sandoval, no one told defendant to make a U-turn, but he did. As they passed the Impala going the opposite direction, defendant said he saw someone make a gang sign disrespectful to the Latin Kings. No one in defendant's car responded. Defendant did another U-turn and pulled his vehicle up next to the Impala at an intersection. Sandoval said that defendant then made a hand gesture that Sandoval interpreted as a "go ahead" signal. It was not a gang sign, and Sandoval could not remember if defendant used one hand or two. Sandoval demonstrated the gesture at trial. The State described it on the record as Sandoval taking both of his hands in front of him and moving them to the right side of his body several times.

¶ 17 On cross-examination, Sandoval agreed with defense counsel that the gesture was a cupping of both hands and then a motion like he was carrying or throwing something with his hands. Sandoval admitted that it could have been just one hand. He also admitted that he had testified at a previous trial that the hand gesture was not really a signal at all, and that it meant nothing.[2] However, he explained that at the first trial he thought the attorney was asking him if

_____

[2] Defendant's first trial resulted in a deadlocked jury.

the gesture had gang significance, which it did not, and that is what he meant when he said the gesture meant nothing. He confirmed that he thought the gesture was a "go ahead" signal.

¶ 18    Sandoval said that Reyes then leaned halfway out of the vehicle's window and Sandoval heard gunshots. He could tell that Reyes fired shots at the Impala. Sandoval said it "just happened out of nowhere." After the shots were fired, defendant drove straight off. Sandoval did not direct defendant where to go. After defendant stopped at an apartment complex everyone was talking and panicking because something had just happened that they did not plan. Defendant parked his vehicle, and Sandoval suggested they call someone to pick them up because he was pretty sure someone would have a description of the Tahoe. They all argued about how they could get back home. They discussed getting rid of the gun, but Aguilar, Reyes and defendant started the discussion. Reyes then got out of the vehicle to hide the gun. They made another stop in a different set of apartments and when Aguilar told Reyes to get rid of his sweatshirt, he did.

¶ 19    Sandoval said that they drove out of the apartment complex and passed a squad car that soon began to follow them. Aguilar and Corral wanted to jump out of the vehicle. Defendant did not stop the Tahoe or say anything. When the vehicle was eventually stopped by the police everyone was arrested.

¶ 20    Sandoval told the police that he "kind of knew where the gun was" and that he wished to cooperate. By testifying against a fellow gang member he was no longer a Latin King. Also, cooperating with the police could result in a "violation," or punishment, from other gang members. As a punishment he could be beaten, shot, or killed. However, he had not received a violation for testifying in defendant's first trial.

¶ 21    Corral testified that he had met Reyes around three times before the night of the shooting, but he did not know defendant. Before they went to the party that evening, they all met at Aguilar's

house. He could not remember when Reyes came to Aguilar's house. When he and Reyes returned from checking out the party, Aguilar pointed out two men coming out of the party who got into an Impala next to them. Corral did not remember testifying in a prior proceeding that Aguilar identified the two men as belonging to the Ambrose gang. Corral admitted that he made a sign disrespectful to the Ambrose gang, and then flipped them off. He claimed that he was not a gang member, although he was familiar with the gangs in the area and he knew that Sandoval was a member of the Latin Kings.

¶ 22 Corral said that defendant drove away after he flipped off the men in the Impala. He then rolled another blunt. He was not paying attention to anything—he had his head down and was concentrating on filling a cigar casing with marijuana. However, he admitted that he had previously testified that he heard Aguilar say that someone in the Impala made a sign disrespectful to the Latin Kings.

¶ 23 Defendant pulled up to an intersection. Corral said he could not recall anyone talking at that time. Corral heard shots ring out, and he ducked. He was high at the time, and he could not feel whether the Tahoe was moving or not. On cross-examination, Corral admitted that although he said he did not remember anyone talking when defendant pulled up to the intersection, he told detectives on the night of the shooting that defendant had turned down the radio and asked which way would get them home.

¶ 24 After the shooting, defendant, Aguilar and Sandoval appeared shocked. Corral could not see Reye's expression. Defendant was driving and Corral did not know where they were, but it looked like a type of "condo place." Defendant made two stops. Reyes got out of defendant's vehicle both times, and the second time he returned without wearing his hoody sweatshirt. As they drove out of the complex defendant did not say anything. However, Corral acknowledged that he

testified in a prior proceeding that he told the detectives that at the time defendant said, "just chill, just chill, we all got lawyers."

¶ 25    Eduardo Gaytan testified that on the night of the shooting he was at a party with Jason Ventura and Jorge Ruiz. They left the party and decided to go to a different party. Ventura was going to drive them to the party. As Gaytan walked toward Ventura's Impala, he saw a black Tahoe with a driver and a passenger in the truck.

¶ 26    Gaytan said that he got into the front passenger seat in Ventura's vehicle and they followed his friend Arnulfo Carillo, who was driving a different vehicle. They drove to the intersection and stopped at the light. Carillo was turning right, but they were turning left. Gaytan then heard gunshots and the windows of the Impala shattered. He was hit in his arm and hip. Later at the hospital Gaytan spoke to Officer Steve Kaus, and he viewed a photo array. He identified Reyes as the shooter. He admitted that in a prior proceeding he testified that at the time, he could not identify who was in the truck.

¶ 27    Gaytan said that he was not in a gang but had family who were members of the Ambrose gang. On the night of the shooting he never flashed the Ambrose sign and he never saw Ventura or Ruiz make any gang signs. He admitted that he used to "claim" Ambrose and got into trouble at school for drawing gang signs which were disrespectful to the Latin Kings.

¶ 28    Jorge Ruiz testified that when he left the party he got into the back of Ventura's Impala. He saw a black SUV stop right next to them going in the same direction. He saw a hand rise with a middle finger extended, but he could not see who gave the gesture. Ventura was following Carillo's vehicle. Ruiz then saw the SUV speed back in the opposite direction. Ventura and Carillo both arrived at the stoplight. He then heard gunshots from behind and he ducked down. The Impala's windows were shattered. He saw the black SUV go straight through the intersection.

¶ 29    Ruiz said at that point Ventura was not conscious and the Impala was moving through the intersection. He then grabbed the wheel from the back seat and turned to the right as much as possible. The Impala hit a tree and Ruiz jumped out of the vehicle. Ruiz was physically unharmed. Ruiz denied that he was a member of a gang and said that no one in the Impala was doing anything to represent the Ambrose gang.

¶ 30    Officer Jeffrey Hahn testified and offered expert testimony regarding gang investigation, motivation and membership. He said that the Aurora police department regularly gathered gang information. He said there were three ways to become an official gang member: (1) to be beaten into the gang; (2) to be "blessed" into membership; or (3) to commit an a criminal offense, typically a shooting or a murder, which was the most common method of membership. The police, however, had separate criteria for their own three classifications of gang membership which were made based on the type of "gang contact" officers have with suspected gang members. If a person was seen with a certain number of the nine criteria present, a suspected member could be classified by the police as a gang member, an associate, or "other." If there was no gang contact in 12 months, the person was considered inactive.

¶ 31    Hahn said that the Aurora police department considered Ruiz to be an Ambrose associate with four prior gang contacts. Gaytan was considered a gang "other." Aguilar, Reyes and Sandoval were all self-admitted members of the Latin Kings. Sandoval had 28 prior gang contacts. Corral and defendant were considered Latin King members by criteria. This meant that each of them had three gang contacts within a 12 month period and each of those contacts had two criteria present.

¶ 32    Hahn testified about defendant's prior gang contacts. In June 2006 he wore his hat turned to the left and was in the company of known Latin King members. In July 2006 he was a passenger

in a vehicle that was stopped by the police. Programmed into the digital face plate of the stereo was "V-L-K, Vice Lord Killer" and "2K, Deuce Killer." In August 2006 he was stopped by the police along with two known gang members, one of whom was wearing Latin King colors. Defendant, however, was not wearing gang colors at that time. Hahn said the Latin King gang colors were gold and black. In April 2009, eight months before the shooting, defendant was seen wearing a white, gold and black shirt, and a gold and black Chicago Bulls hat. Although defendant had never admitted that he was in a gang, and Hahn was not aware that he had any gang tattoos, defendant had admitted to the officer who approached him in April 2009 that the Aurora police department would most likely consider him to be a Latin King, and he admitted to hanging out with them very regularly. Finally, Hahn said that he had read defendant's text messages from the night of the shooting and there was nothing in the texts about planning the shooting. Hahn also verified that defendant did text his girlfriend that evening.

¶ 33    The gun, several spent bullets and 11 shell casings were recovered from the scene. A black hoody sweatshirt was also recovered, and it tested positive for gunshot residue. Everyone in defendant's vehicle could be excluded from contributing DNA to the sweatshirt except for Reyes. Gunshot residue tests were conducted on Reyes, Sandoval, Aguilar, Corral and defendant, and all were negative. Two out of three gunshot residue tests came back positive on defendant's vehicle.

¶ 34    During closing arguments, the State acknowledged that there was no plan, but instead argued the shooting was an opportunity that presented itself for the occupants of the Tahoe to boost their reputation in the Latin King street gang. The State emphasized that defendant's act of driving the vehicle, and in facilitating the escape, aided and abetted Reyes such that a jury could infer that they had a shared intent to kill Ventura, Gaytan and Ruiz. The State also alleged the "gang

mentality" should be considered as defendant's intent because, "[w]hen you are a King, you're not just along for the ride."

¶ 35    The jury returned verdicts of guilty for the first degree murder of Ventura and the attempted first degree murders of Gaytan and Ruiz. Defendant filed a motion for a new trial. At the hearing on the motion, the trial court commented that accountability was the crux of the case and commented:

> "I believe the facts showed it was a reasonable verdict based on the evidence that the defendant piloted that car in position in order to further [sic] or promote or facilitate a crime, and I believe that that satisfies the common design rule under Illinois."

¶ 36    The motion for a new trial was denied. Defendant was subsequently sentenced to 30 years' imprisonment for Ventura's murder, and 15 and 10 years' imprisonment on the two attempted murder convictions. All sentences were to be served consecutively. On appeal, we affirmed defendant's convictions under a common design theory of accountability. *Salazar I.*

¶ 37    On July 1, 2016, defendant filed a petition for post-conviction relief and a claim of actual innocence based on newly discovered evidence. Attached to the petition was Reye's affidavit in support of defendant's petition. In the affidavit Reyes swore that he gave inaccurate testimony at his jury trial. He said that at no time before the present was he willing to speak with defendant or his attorneys about his knowledge surrounding the events in question because his counsel advised him not to testify on behalf of defendant. If he had he been subpoenaed as a witness in defendant's trial Reyes would have invoked his Fifth Amendment right to remain silent. He was now waiving his Fifth Amendment right and was giving the following statement under oath.

¶ 38    Reyes said that on December 19, 2009, Aquilar called him and he went over to his house. Aquilar told Reyes that there was a party in Oswego. Fifteen minutes later a truck pulled up but

Reyes did not recognize the driver. Then Sandoval and Corral pulled up in a small car. Sandoval asked Reyes to hold a gun for him and told Reyes not to tell anyone about the gun. Then the men got into defendant's truck. Reyes said this was the first time that he had met defendant. He, Aguilar and Sandoval were Latin Kings. To Reyes' knowledge defendant was not a member of the Latin Kings. In the truck Reyes was the front passenger, Corral sat behind him, Sandoval sat in the middle seat and Aguilar sat behind defendant. When they got to the party Reyes and Corral went into the party to check it out. They came back to the truck and told the others that there was a charge to get in the party. Defendant asked the others if they were going to stay or go back to Aguilar's house. Defendant wanted to meet up with his girlfriend.

¶ 39      A few people came out of the car and Sandoval "flicked them off" and threw some gang signs at them. Reyes also "flicked them off." The car with those people in it pulled from around the truck to "take off." Defendant then said, "[y]ou all going back to the party, right?" Corral saw one of the passengers of the other car make a hand gesture. Corral told the others that the people in the car had "dissed" them. Corral kept on changing his mind about whether to go back to the party. Defendant told Corral to make up his mind. He then drove toward an area where they eventually got to a stoplight. Corral said, "[t]here goes the car from the party."

¶ 40      Reyes said that as they got closer to the intersection, he saw defendant texting on his cell phone. Defendant asked how to get home They came to a stop at the stoplight. Corral then tapped Reyes on the shoulder and gave him the "go ahead" to shoot at the car. Reyes "knew what time it was because [Sandoval] had given me the gun at [Aguilar's]." He looked at Corral one more time and did what Corral told him to do. He shot the gun and it started going off in a fast-like motion. Reyes said that defendant had no part in his decision to fire the gun in the car and did not help him in any way. After the shooting defendant drove the car away. Corral told defendant how to get to

some apartments. When they got to the apartments Corral and Aguilar told him to get rid of the gun. Reyes got out and stashed the gun in a grill. When he got back to the car defendant and Corral were arguing. Corral tried to tell defendant to take them back to Aguilar's. Defendant told Corral to get out of the car. Defendant then said that he was going to his girlfriend's house and everyone else was going to Aguilar's house. A police car then stopped the truck at Broadway and Evans Streets. Corral told them to try and make an attempt to run toward an alley. Reyes said defendant said "no" and that he did not want anything else to happen. They were then all pulled out of the car. Finally, Reyes said that he was making the affidavit to take full responsibility for his actions and to make it clear that defendant was not responsible for his actions.

¶ 41     The evidentiary hearing was held on March 16, 2018. At the hearing defendant's attorney asked him whether he would have invoked his Fifth Amendment right to remain silent if he had been subpoenaed to be a witness in defendant's trial. After asking for clarification several times Reyes said that he would not have taken the Fifth Amendment and that he would have testified. Counsel then directed Reyes to his affidavit, where he swore that if he had been subpoenaed in defendant's trial, he said that he would have taken the Fifth Amendment and not testified. Reyes then agreed with that interpretation and said, "[y]es, yes. My bad." However, when Reyes was asked on cross-examination if he "would have testified at the defendant's trial if he had called you, because he's your friend, right?" Reyes answered "yes." He later again repeated that he would have testified.

¶ 42     Reyes testified that on December 19, 2009, Aguilar called him and asked him to come over to his house. He and Aguilar were Latin Kings. When Reyes arrived, Aguilar asked him if he wanted to go with him and Sandoval to a party in Oswego. A little while later a truck pulled up, and then a small car pulled up. Sandoval and Corral were in the small car. Sandoval asked Reyes

if he was going to the party. Reyes said he was, and Sandoval mentioned that there could be danger at the party. Sandoval handed Reyes a .45 caliber handgun. Sandoval told Reyes not to tell anyone about the gun. Reyes put the gun in his waistband and approached the truck. When Reyes got into the truck, he met the driver, a "bigger guy," whom he identified in open court as defendant.

¶ 43    Reyes testified that he had never met defendant before that day and he did not know if defendant was a member of the Latin Kings. In the truck defendant was the driver, Reyes was in the front passenger seat and Aguilar, Sandoval and Corral were in the back seat. Reyes did not tell defendant that he had a gun.

¶ 44    When they arrived at the party Reyes and Corral went in to check out whether it was a "good" party. Reyes found out that there was a five dollar charge to get into the party. No one in the truck wanted to pay the charge, so they all left. At that point defendant said that he wanted to go see his girlfriend. While the five of them were outside the party, some people came out of the party and were walking in the direction of defendant's truck. They got into a car but could not leave because of traffic. As the five men were driving off in the truck, Reyes saw some people in the other care "flicking" the five men in the truck with the middle finger. Corral told the group that the other car had thrown a gang sign.

¶ 45    Reyes said that eventually they got to a stoplight. Sandoval recognized another car at the stoplight as the one from the party. Defendant was looking at his phone and seemed to be texting. Someone in the back of the truck then tapped Reyes on the shoulder. Reyes already "knew that time it was." He knew that the people in the car "had gotten into it" with the people in the truck by throwing disrespectful hand signs. Reyes interpreted the tap on the shoulder to mean that he should start shooting. Defendant never gave Reyes any signal to start shooting. After the shooting Sandoval told defendant to drive away and he did. When they arrived at some apartments Aguilar

and Sandoval told Reyes to get out of the truck and hide the gun. He got out of the truck and hid the gun in a grill. He was gone about five minutes. Reyes returned to the truck and defendant started driving again. Eventually they were stopped by the police.

¶ 46    Reyes conceded that he lied to the police when he was arrested. He also said that he lied many times throughout his trial. He never told the police in the interview after he was arrested that defendant had signaled him or had given him a "go ahead" sign.

¶ 47    On cross-examination Reyes admitted that he had been convicted of first-degree murder for killing Ventura and that he had been resentenced the morning of the hearing to 66 years' imprisonment in that case. He had 53 years left to serve on that sentence. He agreed with counsel that it was fair to say that he was going to be a very old man when he was released from prison and that he had nothing to lose by testifying on defendant's behalf at this hearing. His testimony at this hearing was the fourth version of events that he had proposed

¶ 48    On re-direct Reyes identified Sandoval as the leader of the group. He said that Sandoval had a higher rank in the Latin Kings than he did, and he had deliberately told lied to the police and told them Corral rather than Sandoval gave him the gun because of Sandoval's "reputation" and "street credit."

¶ 49    The trial court denied the petition in a written opinion. Specifically, the court first found that defendant had not sustained his burden of proving that the evidence presented was new. It noted that in Reyes' affidavit he stated that he had been advised by counsel not to testify at defendant's trial and that, had he been subpoenaed to testify, he would have invoked his Fifth Amendment right to remain silent. However, the court said that it was equally true that during Reyes' cross-examination he testified that he *would have testified* at defendant's trial had he been called as a witness. Further, even if it had found the evidence to be new and to have been

unavailable at defendant's jury trial, Reyes was not a credible witness. It referred to Reyes' demeanor while testifying, including very long pauses that he took before he answered certain questions. Reyes was a convicted murderer who was a member of the Latin Kings and defendant was a fellow Latin King. Reyes even said that he was testifying in order to help defendant, his friend. Finally, the court noted that even if it found Reyes to be credible, it would have to consider whether Reyes' testimony was of such conclusive character that it would "probably change the result on retrial." In finding that Reyes' testimony did not meet this standard, the court said that Reyes and defendant were fellow gang members, so Reyes' testimony had questionable value. Also, during defendant's trial, the jury heard the testimony of witnesses regarding defendant's involvement in these crimes. The jury heard about defendant making several U-turns that allowed defendant's truck to line up adjacent to the victims' vehicle. The jury also heard testimony about defendant's actions after the shooting, which included fleeing the scene of the crime and driving the vehicle to different locations where there were attempts to dispose of the evidence. Finally, the court said that even if Reyes had testified at defendant's jury trial consistent with his affidavit that he submitted with defendant's post-conviction petition, the evidence introduced at defendant's jury trial still would have been sufficient to convict defendant. Accordingly, the court denied defendant's petition for post-conviction relief and claim of actual innocence. Defendant timely appealed.

¶ 50                                    II. ANALYSIS

¶ 51     On appeal, defendant argues that the trial court erred when it denied his third stage post-conviction petition that alleged actual innocence based on newly discovered evidence.

¶ 52     The Post-Conviction Hearing Act allows a defendant to make a collateral attack on his conviction, alleging a violation of a constitutional rights showing that defendant suffered a

substantial deprivation of those rights. *People v. Williams*, 2017 IL App (1ˢᵗ) 152021, ¶ 19 (citing *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006)).

¶ 53    At a third-stage evidentiary hearing the defendant must show, by a preponderance of the evidence, a substantial violation of a constitutional right. *People v. Coleman*, 2013 IL 113307, ¶ 92.  The circuit court has wide discretion in deciding what evidence to consider (*Williams*, 2017 IL App (1ˢᵗ) 152021, ¶ 22) and acts as the finder of fact at the evidentiary hearing, resolving any conflicts in the evidence and determining the credibility of witnesses and the weight to be given particular testimony (*People v. Domagala*, 2013 IL 113688, ¶ 34).  *Pendleton*, 223 Ill.2d at 473.

¶ 54                          A.  Standard of Review

¶ 55    Before reaching the merits of defendant's appeal we must first address the standard of review.  Defendant acknowledges that when a petition has advanced to a third-stage evidentiary hearing where fact-finding and credibility determinations are made, the trial court's decision will not be reversed unless it is manifestly erroneous, citing *People v. Beaman*, 229 Ill. 2d 56, 71 (2010).  A ruling is manifestly erroneous only if it contains error that is clearly evident, plain, and indisputable. *People v. Hughes*, 329 Ill. App. 3d 322, 325 (2002).  However, defendant also argues that if no fact-finding or credibility determinations are necessary at the third stage, *i.e.*, no new evidence is presented and the issues presented are pure questions of law, the trial court shall apply a *de novo* standard of review, *unless* the judge presiding over the post-conviction proceedings has some special expertise or familiarity with defendant's trial or sentencing and that familiarity has some bearing upon the disposition of the post-conviction petition. *People v. English*, 2013 IL 112890, ¶ 23.

¶ 56    Defendant correctly notes that the trial court judge who presided over his third-stage evidentiary hearing, Timothy J. McCann, was not the same judge who presided over the trial.  That

judge was John A. Barsanti. Therefore, the post-conviction judge had no special expertise or familiarity with defendant's trial. Normally, then, since new evidence was presented (Reyes' affidavit and his testimony), a manifestly erroneous standard would be applied to the appeal of a third-stage post-conviction petition. However, defendant contends that since the trial court denied his petition on four separate grounds, each ground should be reviewed on a specific standard.

¶ 57    Specifically, defendant notes that the court denied his petition when it found:  (1) the evidence was available at the time of his first hearing and was therefore not new; (2) Reyes was not a credible witness; (3) Reyes' testimony, even if truthful, "might not have been persuasive and therefore was not of such conclusive character that it would probably change the result on retrial"; and (4) even if the jury heard Reyes' testimony and he had testified consistently with his affidavit, the evidence would still have been sufficient to support defendant's conviction. Defendant claims that the trial court's first, third and fourth findings should be reviewed *de novo* because those findings do not involve any special expertise or familiarity with his trial or sentencing. Defendant acknowledges that the trial court's second finding, however, should be reviewed for manifest error.

¶ 58    In response, the State argues that new evidence was presented at the hearing in the form of Reyes' affidavit, and his testimony and fact-finding and credibility determinations were made by the trial court. It claims that the three findings that defendant would like reviewed *de novo* were not purely legal issues, and that all four findings included an assessment of Reyes' testimony and his credibility

¶ 59    We agree with the State that the trial court's order denying defendant's third-stage evidentiary hearing on his post-conviction petition alleging actual innocence should be reviewed under a manifest weight of the evidence standard. Defendant overlooks the word *decision* in the sentence "[f]ollowing an evidentiary hearing where fact-finding and credibility determinations are

involved, the trial court's *decision* will not be reversed unless it is manifestly erroneous." (Emphasis added.) *Beaman*, 229 Ill. 2d at 71. Here, Reyes' affidavit was attached to defendant's post-conviction petition and he testified at the third-stage hearing. Therefore, the evidentiary hearing was one where fact-finding and credibility determinations were involved. Even if some of the trial court's findings may have only referred to issues of law, its *decision* was clearly made after reviewing the new evidence of Reyes' affidavit and his testimony. Accordingly, we review the trial court's order under the manifest weight of the evidence standard.

¶ 60                                    B. Actual Innocence

¶ 61    We now turn to defendant's claim that the trial court erred in denying his third-stage post-conviction petition based upon actual innocence. Specifically, he claims that the trial court improperly weighed the credibility of Reyes' testimony at the hearing along with the content of Reyes' affidavit. He argues that Reyes was not available for his trial and therefore, Reyes' testimony should be considered newly discovered evidence. He also claims that he was not accountable for Reyes' conduct because he had no prior or contemporaneous knowledge of Reyes' possession of a gun or Reyes' intent to shoot at gang members in another vehicle.

¶ 62    Our supreme court has held that evidence of actual innocence must be: (1) newly discovered; (2) not discoverable earlier through the exercise of due diligence; (3) material and not merely cumulative; and (4) of such conclusive character that it would probably change the result on retrial. *People v Sanders*, 2016 IL 118123, ¶ 24 (citing *People v. Edwards*, 2012 IL 111711, ¶ 32). Probability, not certainty, is the key since the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together. *People v. Coleman*, 2013 IL 113307, ¶ 97.

¶ 63    "The United States Supreme Court has emphasized that claims of actual innocence must be supported 'with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.' " *People v. Jones*, 2017 IL App (1st) 123371, ¶ 44 (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)).  "Claims of actual innocence are rarely successful because such evidence is obviously unavailable in the vast majority of cases." *Jones*, 2017 IL App (1st) 123371, ¶ 44.

¶ 64    After a careful review of the record we find that the trial court's order denying defendant's third-stage post-conviction petition was not against the manifest weight of the evidence.

¶ 65    Regarding the first requirement, that the evidence presented was "new," we agree with the trial court that Reyes' testimony could have been discovered before based upon his own testimony. Even if we give Reyes the benefit of the doubt that he might have been confused the first time he was asked by defendant's counsel whether or not he would have testified at defendant's trial and he said he *would have* testified and then he corrected himself and said, "my bad," he continued to testify *twice* on cross-examination that he *would have* testified at defendant's trial.  This contradictory testimony destroyed any chance for this evidence to be considered "new."  We agree with the trial court that by making the decision to not call Reyes during defendant's trial, and then by having equivocal evidence about whether Reyes would have testified at trial, we are unable to find that the evidence was "new" and was "unavailable" to defendant at his initial trial.

¶ 66    As support for his claim that the evidence presented at the third-stage hearing was new, defendant identifies five "critical facts."  He contends that none of these facts were known to defendant until after his trial had concluded, and Reyes provided them by affidavit or in his testimony at the hearing.

¶ 67    Defendant's first critical fact is that Reyes testified that he received the gun from his fellow Latin King gang member, Eloy Sandoval, who gave it to him shortly before the incident with instructions to use it in case of danger.  Second, Sandoval told Reyes not to tell anyone about the gun.  However, it was not contested at trial that defendant was unaware of the gun in the car. Therefore, these facts are merely cumulative to those presented at defendant's trial.

¶ 68    Third, Reyes said that Sandoval, as well as Corral, had "flicked off" the people in the other car.  Again, this fact is cumulative since there was testimony at defendant's trial that occupants of the cars were flicking each other off and flashing gang symbols to each other.    Fourth, Reyes said that Sandoval was not only a Latin King, but Sandoval had a higher rank in that gang than Reyes and Corral, and he had "street credit" for having guns.  We fail to see how Sandoval's higher ranking as a Latin King is material for purposes of defendant's actual innocence claim, and at defendant's trial there was testimony that Sandoval, Reyes and Corral were Latin King members.

¶ 69    Finally, defendant refers to Reyes' testimony that one of the Latin Kings in the back seat tapped Reyes on the shoulder and gave him the "go-ahead" signal to begin shooting.  This evidence does contradict evidence that was presented at trial, specifically, that defendant gave the "go ahead" signal to Reyes to begin shooting.  Defendant claims that "[w]ithout the existence of a 'common design' based upon the "go-ahead" signal, evidence of [defendant's] accountability was virtually non-existent."

¶ 70    We are not persuaded.  Even if Reyes' testimony that someone else in the car other than defendant had given him the "go-ahead" signal was admitted into evidence at defendant's trial, there was overwhelming evidence that defendant shared a common criminal design with Reyes and was accountable for his conduct.  Evidence was presented at defendant's trial that he had "piloted" his truck to put it in a good position for Reyes to shoot.  There was also evidence that

defendant fled in his truck with Reyes after the shooting, allowed Reyes to get out of the truck to hide the gun and change clothes, and was still fleeing with Reyes when the police pulled him over and he was arrested. As we noted in *Salazar* I, common design need not be a preconceived plan if evidence indicates defendant's involvement in the spontaneous acts of the group. *People v. Cooper*, 194 Ill. 2d 419, 435 (2000); *Salazar I* ¶ 41. Proof that the defendant was present during the preparation of the offense, that he fled from the scene, that he maintained a close affiliation with his companions after the commission of the crime, and that he failed to report the crime are all factors that the trier of fact may consider. *People v. Perez*, 189 ¶Ill. 2d 254, 267 (2000).

¶ 71 Defendant also notes that in *Salazar I* this court rejected his reliance on *People v. Johnson*, 2013 IL App (1st) 122459 because that case involved the "shared intent" theory of accountability and not a "common design" theory of liability, and because that decision had been vacated by the Illinois Supreme Court and remanded for reconsideration in light of *People v. Fernandez*, 2014 IL 115527. *Salazar I* at ¶ 46. However, defendant notes, after remand, the *Johnson* decision was reaffirmed. *People v. Johnson*, 2014 IL App (1st) 122450-B (*Johnson II*).

¶ 72 In *Johnson II* the appellate court said, "[i]n the case at bar, there was neither evidence of a prior intent or advance planning by defendant to transport [the shooter] to shoot the victim, nor was there evidence that defendant participated in a common criminal design; in fact, the evidence showed that defendant did not even know [the shooter] until [the shooter] entered his vehicle. [The shooter] testified that he never told defendant that he planned to shoot [the victim] and that defendant did not even know [the shooter] was armed, and defendant never told the police that he knew that [the shooter] was armed and intended to commit a crime." *Johnson II* at ¶ 133. Again, in this case, there was evidence presented at defendant's trial that before Reyes started shooting at the other vehicle, defendant made multiple U-turns in order to pull up next to the victim's car.

Therefore, *Johnson II* is distinguishable from the instant case and it does not aid defendant on appeal.

¶ 73    Defendant also argues that the trial court erred in finding that Reyes was not a credible witness.  He takes issues with the court's comments that it did not find Reyes to be credible  based upon "his demeanor while testifying" and the "very long pauses that existed before he answered certain questions."  Defendant claims that the trial court ignored evidence that the long pauses before Reyes answered certain questions were adequately explained by his learning disability, "a fact which had been established during Reye's resentencing."  He also objects to the trial court's finding that Reyes was not credible because he was testifying on behalf of defendant, a fellow Latin King.  Defendant claims that "this conclusion was sheer speculation and was wholly unsupported by the record."

¶ 74    Where a trial court's decision to deny a postconviction petition after a third-stage evidentiary hearing is based on disputed issues of fact requiring credibility determinations, we will reverse the decision only if it is manifestly erroneous.  *People v. Coleman*, 183 Ill. 2d 366, 384-85 (1998).  Under this standard, we give deference to the trial court as finder of fact because it was in the best position to observe the conduct and demeanor of the parties and witnesses. *People v. Deleon*, 227 Ill. 2d 322, 332 (2008).

¶ 75    The trial court's credibility determinations were not manifestly erroneous here.  First, the pages that defendant cites to in support of his claim that Reyes' long pauses can be explained by his learning disability contains no such information.  Also, even if that information came out at Reyes' resentencing hearing, defendant does not claim that the trial judge that heard defendant's third-stage petition was the same one that resentenced Reyes.  Second, the trial court's conclusion that Reyes was not credible since he was testifying on behalf of a fellow Latin King was supported

by the record. Sandoval testified at defendant's trial that defendant was indeed a Latin King member. Also, on cross-examination at the hearing when asked, "[s]o, you would have testified at the defendant's trial if he had called you, because he's your friend, right?" Reyes answered "yes." However, he had earlier testified at the hearing that he had never met defendant prior to the shooting. Finally, and most important, Reyes testified that he would be a very old man when he was released from prison and that he had nothing to lose by testifying on defendant's behalf at the hearing. For all these reasons, we find that the trial court's determination that Reyes was not a credible witness was not in error.

¶ 76 Since we have found that the evidence presented by Reyes at the third-stage hearing was not new, material or noncumulative, we need not determine whether that evidence was of such a conclusive character that it probably would have changed the result on retrial. For all of these reasons, we hold that the trial court properly denied defendant's third-stage post-conviction petition alleging actual evidence.

¶ 77                              III. CONCLUSION

¶ 78 In sum, the proper standard of review here is manifest weight of the evidence because the court reviewed evidence from Reyes in the form of his affidavit and his testimony at the third-stage hearing. The trial court properly denied defendant's third-stage post-conviction petition when it found that Reyes was not a credible witness. It also correctly found that the evidence presented was not new since Reyes gave equivocal testimony about whether he would have testified at defendant's trial. Also, the evidence presented was either cumulative to the evidence presented at defendant's trial or not material. Therefore, we did not need to address whether the evidence was of such conclusive character that it would probably change the result on retrial.

¶ 79 Accordingly, the judgment of the circuit court of Kendall County is affirmed.

¶ 80    Affirmed